**UNITED STATES of America, Appellee,**

v.

**Allen L. JARABEK, et al., Defendants, Appellants.**

No. 82–1849.

United States Court of Appeals, First Circuit.

Argued Oct. 5, 1983.

Decided Feb. 1, 1984.

Earle C. Cooley, Boston, Mass., with whom Deborah A. Ramirez, Newton Center, Mass., Robert W. Thuotte, Brookline, Mass., Hale & Dorr, Boston, Mass., and William E. White, Fall River, Mass. were on brief, for defendants, appellants.

A. John Pappalardo, Asst. U.S. Atty., Dedham, Mass., with whom William F. Weld, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before BREYER, Circuit Judge, TIMBERS,* Senior Circuit Judge, and SMITH,** Senior District Judge.

TIMBERS, Circuit Judge.

Allen L. Jarabek and Thomas E. Alecrim appeal from judgments of conviction en-

tered in the District of Massachusetts on November 4, 1982, after a ten day jury trial, for conspiring to violate and violating 18 U.S.C. § 1951 (1982) (Hobbs Act). For the reasons set forth below, we affirm.

## I.

### FACTS AND PRIOR PROCEEDINGS

We find it appropriate to set forth the facts in some detail. As in any Hobbs Act prosecution, the facts are critical—especially in the instant case where the charged extortion was of a subtle character. Except where otherwise stated, all events prior to the indictments occurred during 1979 and January 1980. There was evidence from which the jury could have found the following facts.

### (A) The Construction Project

In the Spring of 1979, the City of Fall River, Massachusetts, requested bids from contractors to supply and install a security fence around the perimeter of the B.M.C. Durfee High School. The bids were opened on May 16. New England Chain Link Fence Co., Inc. (New England Fence), a corporation based in Dorchester, Massachusetts, whose president was Richard A. Miara, was the low bidder. New England Fence at that time grossed approximately $800,000 per year. It obtained its materials through interstate commerce. After resolution of some confusion regarding the terms of the contract, it was finally executed on August 13.[1] Work was begun at

---

* Of the Second Circuit, by designation.

** Of the District of Montana, by designation.

1. The specifications in the bid were for 3150 feet of 9-guage fencing, but a letter to New England Fence dated June 19, 1979 from the Fall River city engineer advised that the school committee had adopted a recommendation to contract with New England Fence on the basis of an alternate bid which provided for 6-gauge fencing. After an exchange of internal letters, the city decided that it was obliged to execute a contract based on the original bid specifications and not on any substitute specifications with respect to the gauge of the fencing. Ac-

cording to Miara's testimony, his estimator was under the impression that a change order eventually would be processed which would provide for the heavier, 6-gauge fencing. The city engineer also urged, as early as June 27, 1979, that the contract be modified to provide for an additional 1350 feet of fencing so as to enclose the entire perimeter of the high school grounds. During the summer he apparently conveyed to New England Fence his understanding that such a change order certainly would be processed, since New England Fence had ordered 5000 feet of 6-gauge fencing from a supplier in Baltimore as early as August 23, 1979, over a month before the change order actually was executed by all parties. The circum-

the high school site soon thereafter by a subcontractor hired by Miara.

The initial work done at the site was the installation of 112 fence posts. This installation was in an area staked out by the city engineer, but which was not covered by the original contract specifications. Miara did not become aware of this until September 19. An on-site inspector for the City of Fall River supervised the work. In late August, however, appellant Jarabek, who at that time was an elected member of the Fall River School Committee and Chairman of the Subcommittee on Buildings and Grounds, appeared at the work site and complained that the posts had not been installed as specified in the contract. His complaint was not about the location of the posts but rather about the depth to which they had been installed. This was followed by a letter dated August 31 from appellant Alecrim, who at that time was the Assistant Superintendent of the Fall River School Department. In his letter Alecrim stated that the quality of work performed at the site did not meet specifications and that work should not be resumed until all parties could discuss the problem. This letter, according to Miara, was the first contact that he personally had had with any official from Fall River. Miara telephoned Alecrim. During the course of their conversation, a meeting was scheduled at Alecrim's office for September 4. No work was done on the fence between August 31 and September 4.

On September 4, Miara met with Alecrim in the latter's office, along with the Superintendent of the School Department and the City's on-site supervisor, to discuss the problems that had arisen. In particular, they discussed the complaint that the holes that had been dug for the fence posts apparently were neither the correct depth nor the correct shape. It was agreed at the meeting that the 112 posts already installed could remain in the ground; that work would continue in another area of the

school grounds; and that the on-site inspector was to report immediately to School Department officials any further deviations from the contract specifications.

After that meeting, and on the same day, Miara visited the jobsite for the first time. The subcontractor's crew had resumed work in an area away from the location of the disputed posts. During this visit by Miara, Jarabek arrived at the site. Jarabek informed Miara that the 112 posts would have to be removed. Miara then related to Jarabek the agreement reached that morning in Alecrim's office. Apparently angered by this, Jarabek left the jobsite and returned a short while later with Alecrim. Alecrim told Miara that it was Jarabek who had the final word; if he wanted the posts removed, they would have to be removed. Miara then asked Jarabek whether anything could be done to "iron things out". By this, Miara later testified, he wondered whether he could offer a guarantee, or fix the posts, or do anything except pull the posts out. Jarabek replied that the only acceptable solution was to pull the posts out. Alecrim confirmed this in a letter to Miara the following day, September 5, with a copy to Jarabek.

On September 6, Alecrim wrote another letter to Miara. In this letter, Alecrim stated his position that, pursuant to a resolution of the School Committee, work should be stopped completely until a meeting of all parties could be held. He further stated that a meeting of school officials scheduled for September 10 would be an appropriate time to discuss the matter. Miara contacted his attorney, Robert Cohen, who agreed to accompany Miara to the September 10 meeting.

At that meeting, Jarabek restated his demand that all posts in place be removed. After extensive discussion reportedly dominated by Jarabek, a compromise was reached allowing Miara to leave in place the concrete foundations for the posts, but requiring him to cut the posts off at ground

stances of how and why that change order finally was executed are the primary events

which led to the instant Hobbs Act prosecution.

level and to install them nearby. Also part of the compromise was an agreement by the school officials to process within 10 days a change order with respect to the original contract which would provide for the heavier gauge fencing and additional fencing footage. Miara, through his attorney, then stated that, if the change order did not come through, the contract would be performed by New England Fence according to the original specifications. Miara later testified that, even at the time of this meeting, he was unaware that his workers were in an area not covered by the original contract. Immediately after the meeting, Jarabek approached Miara and asked him if he was making any money on the contract. Miara replied in the negative. Jarabek then asked him if he wanted to get out of the contract completely, to which Miara replied no.[2] The terms of the compromise reached at the school committee meeting were confirmed by letter dated September 13 from Cohen to the city attorney.

Miara next ordered his subcontractor to resume work at the high school. No further problems were encountered until September 18, when Miara was told that once again Jarabek had come to the jobsite and had complained about the new holes that had been dug. On September 19, Miara was misinformed that the school committee had not approved the change order the previous evening and was not going to do so. The committee in fact did not meet until the evening of September 19. The change order was neither approved nor rejected at that meeting. On September 19, however, Miara ordered the subcontractor to stop work and to leave the jobsite, since he finally had been informed that the area where all the work had been done was not covered by the original contract.

On Friday, September 21, Miara received a telephone call from his attorney, Cohen. Cohen had just spoken to the city attorney. Cohen reminded Miara that it had been agreed on September 10 that, if a change

order was not approved, New England Fence would proceed according to the original contract. Cohen urged Miara to try to resolve the problem with Alecrim.

On Monday, September 24, Miara called Alecrim and asked for a meeting with Alecrim the following day to go over the terms of the original contract. According to Miara, Alecrim then stated, "Dick, if you hadn't come on so strong, maybe things could have been a little easier." When asked what he meant, Alecrim responded, "It's an election year and campaigning is very expensive." When Miara realized that Alecrim was talking about money, he asked how much. Alecrim told him $2000. Miara then stated that, if the money would help expedite the job, he would go along with it. At this point, Miara reminded Alecrim of his (Miara's) September 4 inquiry to Jarabek whether anything could be done to "iron things out".

Miara then called his attorney, Cohen, and recounted the conversation with Alecrim. Cohen urged Miara, because of the serious implications involved, to go to the meeting the following day to ascertain whether Alecrim indeed was demanding money from Miara. Miara agreed to do so and to report back to Cohen.

On the following day, September 25, Miara went to the jobsite where he met with Alecrim and others. When Miara and Alecrim were alone, Alecrim brought up the subject of the money and asked Miara if he would still go along with it. Miara said that he would, but only on the conditions that the 112 posts already installed be allowed to stay in and that the change order be approved. Alecrim replied that approval of the change order presented no problem, but that Jarabek probably would not go along with leaving the 112 posts in the ground. Alecrim offered to call Jarabek, to which Miara agreed. Alecrim placed a call and asked the answering party to have "Al-

---

**2.** At this point, according to the government, Miara was keenly aware that Jarabek wielded the power to stop construction of the fence. He already had done so twice. Jarabek apparently was aware that Miara needed the change order because he already had the heavier gauge fencing on hand.

len" call back. Ten minutes later, the phone rang. Alecrim answered, "Hi, Allen. Dick's decided to contribute to the war chest, but he wants some concessions." After hearing of Miara's two requested conditions, Jarabek agreed that the change order would be no problem but refused to allow the 112 posts to stay in. He further agreed to a compromise to permit the corner posts and gateposts to stay in, since their removal would be more difficult.

### (B) *The Surveillance*

After Miara left Alecrim, he returned to his office and telephoned Cohen. He told him exactly what happened. Cohen informed Miara that he could pay the money, in which case Cohen no longer would represent him, or he could cooperate with the authorities. Miara agreed to cooperate with the authorities. Cohen then called the Bristol County District Attorney's Office. Eventually Cohen related the events to Assistant District Attorney Philip Rivard-Rapoza. Rivard-Rapoza then called Miara and arranged to meet with him the following day, September 26.

Still on September 25, Rivard-Rapoza called Assistant United States Attorney D. Lloyd MacDonald and briefed him on Miara's story. Rivard-Rapoza called MacDonald because at that time, and since early 1979, federal and state law enforcement officials had been conducting a joint investigation of alleged corruption in other construction work at the B.M.C. Durfee High School. Rivard-Rapoza thought that Miara's allegation of corruption in the security fence construction project was sufficiently related to the joint investigation to bring the federal officials into the picture. MacDonald apparently concurred in Rivard-Rapoza's assessment. He agreed to attend the next day's meeting.

On September 26, at Miara's office in Dorchester, Miara again related his encounters with Alecrim, this time to MacDonald, Rivard-Rapoza, FBI Special Agent Suzanne Mullins, and Massachusetts State Trooper Brian McMahon. It was Agent Mullins who asked Miara if he would consent to

record his future conversations with Jarabek or Alecrim. Miara consented. It was agreed that Mullins would come back the next day and instruct Miara on the use of the recording equipment to be supplied by the FBI. It was further agreed that Miara would be fully reimbursed, from a discretionary fund controlled by the Bristol County District Attorney, for any money that Miara might use to pay off either Jarabek or Alecrim. This arrangement was to avoid the red tape involved if federal funds were to be used. The legality of the electronic surveillance was then discussed among the law enforcement officials. Rivard-Rapoza believed that a warrantless interception with the consent of one of the parties would not violate Massachusetts law, although he pointed out that the issue had never been decided by a Massachusetts court. Agent Mullins requested and obtained permission from the Department of Justice to use the face-to-face body recorder and from the Special Agent in charge of the Boston office to use the phone wiretap—all on the ground that the alleged facts, if proven, would constitute a Hobbs Act violation.

The following day, September 27, Agent Mullins returned to Miara's office and explained to him the use of a phone wiretap. Miara signed the necessary consent forms. He then placed a call to Alecrim. In response to Miara's statement, "I'm talking about the money", Alecrim said, "Well I'm not talking about anything. Well I don't know what you're talking about, frankly." Alecrim then stated that he would be "amazed" if Jarabek interfered with the fence construction anymore.

On October 5, Alecrim advised Miara that the change order was "signed, sealed and delivered". Alecrim was unsure whether Miara would be allowed to keep the corner posts in position. He said that any compromise on those would "not fly"—especially since the city attorney had a copy of Cohen's letter of September 13 stating that the 112 posts would be cut down.

On October 11, Miara and Alecrim talked by phone and set up a meeting for Monday, October 15. During the course of this con-

versation, Miara asked if there was any-thing he should bring. When Alecrim said, "Might as well", Miara stated he would "bring about half of it". Alecrim replied that he was perfectly amenable.

On Monday morning, October 15, on his way to Fall River, Miara stopped at the New Bedford FBI office to be equipped with the body recorder. He was accompanied by Special Agent George Bates to a local bank, where Miara cashed a personal check in amount $1000 which was endorsed by Agent Bates. Miara then continued on to Fall River. FBI agents followed in another vehicle. They eventually set up surveillance at the high school where they would be able to listen to the conversations as they took place.

At the jobsite, Miara met Jarabek. They had some preliminary conversation during which Jarabek was noticeably friendlier toward Miara than he had been on September 4 and 10. Miara then brought up the matter of leaving the 112 posts in the ground. Throughout the remainder of their conversation, Jarabek repeatedly told Miara that, since the high school construction projects were under intense investigation, it would be impossible to leave the posts in position because of the letter from Miara's own attorney, on file with the city attorney, agreeing that the posts would have to be cut down. In short, because of the investigation, they could not get away with leaving the posts in the ground. After a while, Alecrim joined the other two. The three men sat in Alecrim's car. With Alecrim and Miara in the front seat and Jarabek in the back, Miara said he had a thousand dollars, whereupon he handed over his shoulder an envelope to Jarabek. Miara also said that, as soon as he received payment for materials that he had on his premises in Dorchester, he would pay the rest, to which Jarabek responded, "Alright." Alecrim then handed to Miara the signed change order and said, "This is yours." The

three continued to talk in Alecrim's car. They agreed that Miara should submit his bill directly to Alecrim for materials on hand to ensure expedited payment. They further agreed that Miara could leave the corner posts in position and Alecrim would have the city engineer write a letter suggesting that the heavier corner posts already in position would be preferable to the lighter corner posts specified in the original contract.

On November 1, Alecrim and Miara had another telephone conversation. Alecrim said that he wanted to meet with Miara and Jarabek to discuss what dollar amounts should go in the second change order to provide for the sturdier gateposts and also for the installation of a bottom rail along 3000 feet of the fencing at $3.00 per foot.[3] After they set up a meeting for November 7, they agreed that that meeting would be a good time to handle the balance of the payoff.

On November 7, after again being fitted with the body recorder and cashing a check in amount $1000, Miara met with Jarabek and Alecrim at the jobsite. Jarabek and Miara sat in the front seat of Jarabek's car, Alecrim in the back. After they had agreed to the terms of the second change order, Alecrim asked if "you guys got some business." Miara stated he had a thousand dollars. Jarabek, motioning to the armrest between them, told Miara to drop it right there. He did.

The next meeting between Miara and Alecrim was on November 28. Before arriving at the jobsite, Miara again stopped at the FBI office to be fitted with the recorder. At the high school, Miara learned from the city's on-site inspector that the second change order provided for only 3000 feet of bottom rail, whereas 4500 feet of fencing actually had been constructed. Upon Alecrim's arrival at the jobsite while this discussion was going on, he stated that the

---

**3.** During the conversation that Miara had with Alecrim and Jarabek on November 7, referred to below, they discussed the pricing of the bottom rail. Miara estimated a figure of $2.50 per foot installed. Jarabek thereupon said, "He oughta give us better than three dollars a foot . . . and we get fifty cents a foot there to play with." That fifty cents then figured in the computation of the second $2000 payoff. See note 4 *infra*.

difference in money to Miara could be made up through inflated purchase orders. Then Alecrim and Miara drove around to another area of the school grounds to examine part of the fencing that had been damaged by a car. When Miara gave an estimate of $450 to repair the damage, Alecrim said he would price it at $700, stating, "We can make a few extra bucks on it." Alecrim then produced the second change order for Miara and explained, "Allen said to me, there ... there's two grand in here."[4] Miara agreed, as long as he could get another change order for the additional 1500 feet which had not been included in the second change order. Alecrim doubted that this could be done. He again brought up the possibility of an inflated purchase order. Miara asked Alecrim who this second two thousand dollars would be for. Alecrim responded that it was for Jarabek, that he (Alecrim) did not want any part of it. Miara then proposed that he pay $1000 when he received payment of a bill he had just submitted and another $1000 when he received payment of a bill he would submit for the bottom rail.

The next relevant conversation was Miara's telephone conversation with Alecrim on December 14. During the course of this conversation, Alecrim proposed that they meet to clear up all outstanding matters. Miara later testified that he understood this to be a reference to the second $2000. Miara said that he would meet and pay part of it. Alecrim replied that Jarabek thought that Miara should be able to pay the whole amount, after which New England Fence's final request for payment could be processed promptly.

On December 21, Alecrim and Miara met at the jobsite. Miara had stopped at the FBI office to have the recorder attached and at the bank where he cashed a personal check in amount $1500. While sitting in Alecrim's car at the jobsite, he and Alecrim discussed the final figures of the contract. Miara thereupon took the $1500 cash from his pocket—not in an envelope this time—and gave it to Alecrim. Alecrim said that he wished "Allen" were there but he could not make it. Miara promised payment of the final $500 once he received final payment on the contract. During this meeting, Alecrim mentioned several times that Jarabek could ensure that Miara would get other jobs in Fall River in the future through a bid-rigging procedure.

On January 23, 1980, there was a final meeting between Miara and Alecrim. Miara, fitted with the recorder and carrying $500 in an envelope, met Alecrim at the high school. During a short conversation, Miara gave the $500 to Alecrim, mentioning that this time he was able to get an envelope. This was the final meeting between Miara and either of the appellants which had any relevance to this case.

(C) *Prior Proceedings*

Alecrim and Jarabek were indicted in the Massachusetts Superior Court for Bristol County on February 27, 1980, charged with violating and conspiring to violate Mass. Gen.Laws c. 268A, §§ 2(b), 3(b) (Lawyers Co-Op. 1980), which proscribe the solicitation and acceptance of bribes.

On July 16, 1980, after an evidentiary hearing, the court ordered the suppression of all of the tape recordings on the ground that they had been obtained in violation of the Massachusetts wiretap statute, Mass. Gen.Laws c. 272, § 99 (Lawyers Co-Op. 1980). The court held that that statute requires, for warrantless interception, the consent of all the parties participating in the conversation. The suppression order was appealed to the Supreme Judicial Court of Massachusetts. On August 5, 1981, the SJC affirmed the order. *Commonwealth v. Jarabek,* 1981 Mass.Adv.Sh. 1849, 424 N.E.2d 491 (1981).

On March 10, 1982, some seven months later, while the state indictments were still

4. This $2000 figure consisted of (a) $1500 (the gross markup on the bottom rail figure—3000 feet of fencing at fifty cents extra per foot) and (b) $500 (a portion of the extra amount that resulted from estimating the total cost of changing the 16 gateposts from the 4" diameter to 6" diameter at $6400, rather than at their actual cost of $5160).

pending, a federal grand jury returned the instant five count indictment in the District of Massachusetts against both Jarabek and Alecrim, based on the same facts that constituted the basis of the state indictments. Appellants were arraigned and pleaded not guilty on March 18.

On April 8, appellants filed a motion in the federal court to suppress the tape recordings. On April 13, the Bristol County District Attorney *nol prossed* the state indictments against both appellants. On June 4, United States District Judge J. Walter Skinner commenced a hearing on appellants' suppression motion. The hearing lasted five days. On July 9, Judge Skinner, in a well considered opinion, denied appellants' motion, holding that the admission of the tape recorded evidence at appellants' federal trial must be governed by federal, not state, law, and that the recordings had been obtained in compliance with federal law.

Trial of the federal indictment began before United States District Judge W. Arthur Garrity on September 28. After ten days of trial, the jury found both appellants guilty on all counts. The court denied appellants' motions for judgments of acquittal at the close of the government's evidence, at the close of all of the evidence and after discharge of the jury. Judgments of conviction were entered on November 4. Jarabek was sentenced to eighteen months imprisonment. Alecrim also was sentenced to eighteen months imprisonment, but service of the balance of his sentence is to be suspended after six months, at which time he has been ordered placed on probation for two years. Both appellants are at liberty on bail pending the instant appeals.

Appellants argue on appeal (1) that the district court erred in admitting in evidence the tape recordings, claiming that they should have been suppressed under the stricter state statute; (2) that the government failed to prove sufficient interference with interstate commerce to provide the jurisdictional underpinning for a Hobbs Act prosecution; (3) that the district court erred in several of its evidentiary rulings; (4) that the district court erred in its jury charge in several material respects; and (5) that the district court erred in denying appellants' motions for judgments of acquittal.

We shall discuss each of appellants' claims of error seriatim.

## II.

## ADMISSIBILITY OF THE TAPE RECORDINGS

We turn first to the issue upon which appellants' counsel placed principal emphasis during oral argument before us, namely, the claimed error in the admission at their trial of all of the tape recorded evidence. Appellants do not claim that the recordings were obtained in violation of the federal interception statute, 18 U.S.C. § 2510 et seq. (1982).[5] Rather, they claim that the touchstone governing the admission of these recordings should have been the more restrictive Massachusetts interception statute, Mass.Gen.Laws c. 272, § 99 (Lawyers Co-Op. 1980).[6]

---

**5.** Section 2511(2)(c) provides:
"It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where ... one of the parties to the communication has given prior consent to such interception."
Section 2518(10)(a) in relevant part provides: "Any aggrieved person in any trial ... may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter ... on the grounds that—
(i) the communication was unlawfully intercepted...."

Defendants argue that "unlawfully" in the final clause quoted above includes interceptions unlawful under state law.

**6.** Section 99 prohibits most interceptions of oral or wire communications, but excludes from the definition of interception the eavesdropping of a conversation in which all parties consent to the wiretap or if one party consents and the eavesdropper is a law enforcement officer investigating an offense connected with organized crime.

The thrust of appellants' argument is that, despite the heavy federal involvement in the investigation, it was a state investigation for the purpose of bringing a state prosecution. They point to the facts that Miara and his attorney first turned to the Bristol County District Attorney's Office; that Miara was reimbursed out of state funds; that the United States Attorney, at the inception of the investigation, instructed Assistant United States Attorney Mac-Donald that, if the investigation went no further than Jarabek and Alecrim, the state would handle the prosecution; and that the state in fact first began a prosecution. Appellants argue that if, as they claim, this was a state investigation with "mere assistance" from the federal agents, then Congress and several cases cited by appellants require us to apply state law to the issue of the admissibility of the recordings. They claim that the only way federal law could control, on the facts of this case, would be if there had been a prior or contemporaneous, independent, federal investigation.

Judge Skinner held that the recordings were admissible under federal law. While he found that "all of the principals in the investigation believed that they were preparing a case for prosecution in the state court", he concluded that federal law should apply because "the federal officers . . . believed they were operating under authority of federal law, even though in aid of state prosecution." Appellants contend that the former quote is an express finding that this was a state investigation (which they say we may reverse only if "clearly erroneous"), and that the latter quote incorrectly engrafts a good faith exception upon the federal wiretap statute.[7] Appellants urge us to accept Judge Skinner's express finding

but to disregard as irrelevant any discussion of the federal officers' good faith.

At the outset, we reject appellants' characterization of the investigation as a state investigation, as well as their contention that Judge Skinner so found. Indeed, nowhere in his opinion did he use the phrase "state investigation" in referring to this investigation. At most, he found that a state prosecution was intended. That alone is not dispositive of the issue. Moreover, his citation of *United States v. Proctor*, 526 F.Supp. 1198 (D.Hawaii 1981), *aff'd sub nom. United States v. Adams*, 694 F.2d 200 (9th Cir.1982), which involved a joint federal-state investigation, as support for denying the motion, fairly implies that he considered the instant case to involve a joint investigation.

■ Based on our own independent review of the record, we conclude that this was a joint federal-state investigation,[8] conducted primarily by the federal agents and under the express authority of the Department of Justice. That Miara's attorney first called state officials does not bear heavily on whether a federal, state or joint investigation eventually resulted. While the use of state funds to reimburse Miara does support appellants' argument, we think that, compared with the many factors supporting the contrary argument, it becomes of relatively slight importance. It was a federal agent who first suggested the use of recording equipment. Federal officers applied for and received permission from the Department of Justice to use the body recorder on the express representation that the alleged facts might constitute Hobbs Act violations. While the Bristol

7. The good faith involved is said to be the federal officers' belief that they were acting under authority of federal law. In other words, appellants argue that the practical effect of Judge Skinner's conclusion is that, whenever federal officials believe they are operating under the authority of Title III, then Title III should govern the admissibility of any intercepted conversations.

8. We find no merit in appellants' claim that a prerequisite to the use of federal law on this

issue is a finding that an independent federal investigation was underway either prior to or contemporaneous with the cooperative investigation. Appellants have cited no case to support this proposition. Indeed, at least one of the cases that has addressed the issue of the admissibility of tape recorded evidence at a trial in a federal court involved only a state investigation until after state charges were dismissed. *United States v. Nelligan*, 573 F.2d 251 (5th Cir.1978).

County District Attorney was consulted on the use of the recording equipment, Judge Skinner found that it was more out of courtesy, rather than to obtain his permission. The federal authorities supplied the equipment. They took full responsibility for preparing Miara for each meeting with appellants. They retained custody over the original tape recordings and furnished copies to state officials. Surveillance of the meetings between Miara and appellants was conducted primarily by federal agents, although state officers accompanied them on some occasions.

Only after the investigation had been virtually completed was it decided that a state, rather than a federal, prosecution would be undertaken. Judge Skinner's findings are not to the contrary. Appellants place heavy reliance on a discussion that took place in September 1979 between the United States Attorney and the AUSA assigned to the investigation. In that conversation, the United States Attorney said that, if the investigation resulted in evidence inculpating no more than the two appellants, the state should handle the prosecution. The necessary corollary was that, until the scope of the extortion ultimately could be determined, the possibility of a federal prosecution remained. Judge Skinner's finding that the investigative principals thought that they were preparing a case for state prosecution is not inconsistent. From the inception of the investigation, Jarabek and Alecrim were the only two targets. The investigators, therefore, reasonably expected that a state prosecution would ensue. Until the investigation was completed, however, there remained the possibility of additional suspects. Prior to completion of the investigation, a federal prosecution could not be ruled out.[9]

■ Accordingly, we hold that this investigation at all times was a joint federal-state one; that a federal prosecution al-

ways was a possibility; and that the electronic surveillance was conducted properly pursuant to federal practice and procedure.

Having reached this conclusion, we believe that the correct disposition of the issue before us follows with unmistakable clarity. The many cases cited by appellants—including several from the Second Circuit—we find to be inapposite. *E.g., United States v. Sotomayor,* 592 F.2d 1219 (2d Cir.), cert. denied, 442 U.S. 919 (1979); *United States v. Marion,* 535 F.2d 697 (2d Cir.1976); *United States v. Manfredi,* 488 F.2d 588 (2d Cir.1973), cert. denied, 417 U.S. 936 (1974); *United States v. Curreri,* 388 F.Supp. 607 (D.Md.1974).

In *Sotomayor,* while one of many issues presented was the admissibility of wiretap evidence, the asserted ground for suppression was not an illegal interception, but rather whether the evidence was sealed at the time required by state law. Moreover, the wiretaps in that case were obtained through the *sole* efforts of state officers and had been planted pursuant to orders of state judicial officers. Thus, the references the court there made in dictum to deferring to a stricter state standard of permissible wiretap interception are not relevant here.

*Marion* also dealt with interceptions by state officers pursuant to state authority and does not, except for some language in dictum taken out of context, support appellants' claim. Moreover, the court there held that evidence of intercepted communications obtained pursuant to state court orders must comply with federal law requiring subsequent judicial approval of the interceptions when offenses other than those specified in the original application are uncovered. That is not this case.

In *Manfredi* the facts more closely resemble those before us. That case, however, still does not support appellants' claim. There the court discussed the pro-

9. If we were to accept appellants' invitation to us to hold that the federal officers in this case should be bound by their intentions at the beginning of the investigation, we would be requiring law enforcement officials in all future joint investigations to put on the record from the inception their intent to make out a federal case. We decline the invitation. Such a rule would unduly hamper future joint investigations by imposing an unrealistic lack of flexibility inconsistent with the public interest.

priety of the interceptions conducted by a joint federal-state investigation force in terms of state law. The court observed, however, that the federal government subjects itself to the risk that state standards for wiretap interception may control the admissibility of such wiretap evidence when it allows a joint investigation to proceed by the use of a state warrant. Here the federal agents did not subject themselves to such a risk. The investigation did not proceed pursuant to a state warrant. Rather, it proceeded pursuant to the consensually-monitored provisions of Title III, and only after the Department of Justice authorized it.

*Curreri* involved a state investigation with the use of wiretap equipment authorized by a state court order. Federal officials became involved only after the wiretapping was completed. The analysis in this case, upon which appellants rely, must be read in the context of the court's observation that a stricter state statute regarding wiretap interception will be applied by a federal court only in the event electronic surveillance is conducted pursuant to a state court authorization. *Curreri* provides no support for appellants' claim.

■ We have found no federal case that has relied on state law in judging the admissibility of evidence of intercepted communications in any circumstances other than where the electronic surveillance was conducted pursuant to a state warrant or order. On the other hand, a number of cases stand for the proposition that in federal criminal trials, regardless of any violation of state law, the admissibility of wiretap evidence always is a question of federal law. *E.g., United States v. Butera,* 677

F.2d 1376, 1380 (11th Cir.1982), *cert. denied,* —— U.S. —— (1983); *United States v. Horton,* 601 F.2d 319, 323 (7th Cir.), *cert. denied,* 444 U.S. 937 (1979); *United States v. Nelligan,* 573 F.2d 251, 253 (5th Cir.1978); *United States v. Shaffer,* 520 F.2d 1369, 1371–72 (3d Cir.1975) (per curiam), *cert. denied,* 423 U.S. 1051 (1976). In the instant case it is not necessary for us to rest our decision upon this proposition, for here we have federal officers who performed their duties in a lawful manner in a joint investigation. The mere involvement of state officers is not sufficient reason to look to state law to determine the admissibility of interception evidence.[10]

We hold that the district court properly declined to suppress the tape recorded evidence.

### III.

### INTERSTATE COMMERCE

Appellants also claim that there is an insufficient nexus with interstate commerce to provide the requisite jurisdictional underpinning for a Hobbs Act prosecution.[11]

They concede that only a *de minimis* effect on interstate commerce is necessary. They contend, however, that even that effect cannot be found in the instant case. They argue that Miara himself was the victim of the crime—the money was paid from his personal funds—and that he is not engaged in interstate commerce. They argue further that the jurisdictional requirement is not satisfied under a depletion of assets theory, since Miara was fully reimbursed for the money he paid to Jarabek and Alecrim.

---

10. This case does not involve state officers who acted without federal involvement and in knowing violation of state law, which might present a different case. *United States v. Daniel,* 667 F.2d 783, 785 (9th Cir.1982) (per curiam). Federal courts must be careful not to sanction intentional unlawful conduct by law enforcement officers. Judge Skinner, toward the end of his opinion of July 9, 1982, correctly stated the appropriate role of a federal court under such circumstances. We agree.

11. On this appeal the parties entered into the following stipulation dated May 5, 1983 on the issue of interstate commerce:

"The parties hereby stipulate and agree that the Government has proven beyond a reasonable doubt that at all times material to the indictment, New England Chain Link Fence, Inc. was dependent upon interstate commerce for the movement of materials, equipment, supplies and other articles and commodities."

The myopic view of effect on interstate commerce suggested by appellants has been rejected long ago. The Act requires only that the accused have "in any way or degree obstruct[ed], delay[ed], or affect[ed] commerce." 18 U.S.C. § 1951(a) (1982). The language of the indictment tracks the statutory language. To prove jurisdiction under the Hobbs Act, "[t]he government need only show a 'realistic probability that an extortionate transaction will have some effect on interstate commerce' ...." *United States v. DiGregorio,* 605 F.2d 1184, 1190 (1st Cir.), *cert. denied,* 444 U.S. 937 (1979) (quoting *United States v. Hathaway,* 534 F.2d 386, 396 (1st Cir.), *cert. denied,* 429 U.S. 819 (1976)). Indeed, in *Stirone v. United States,* 361 U.S. 212 (1960), the Supreme Court stated that the requisite interstate commerce nexus could be established if the jury found that, unless the victim gave in to the extortionate demands, the victim's business might have been hindered or destroyed, thereby halting or reducing interstate movement of material to the victim's business. *Id.* at 215.

We think that *Stirone* is particularly appropriate here. The jury reasonably could have found that, if Miara had not complied with appellants' requests for payments, appellants might have caused withholding of approval of the first change order. That in turn would have injured the business of New England Fence which depended upon interstate commerce for about 80% of its materials. The jury also could have found implicit in the demands for the second $2000 a threat that New England Fence would have no chance of obtaining any future contracts with the City of Fall River if the money was not paid. Such a direct effect on a company engaged in interstate commerce certainly would obstruct the movement of material in interstate commerce.

■ We hold that the government proved a sufficient effect on interstate commerce to provide the requisite jurisdictional underpinning for a Hobbs Act prosecution.

IV.

## EVIDENTIARY RULINGS

Appellants have raised two claims of error with respect to the court's evidentiary rulings: the exclusion of evidence of alleged bias on the part of Miara; and the exclusion of a defense witness who would have testified about the poor performance by New England Fence of a prior municipal contract. We shall consider in order each of these claims of error.

### (A) *Miara's Alleged Bias*

Shortly before trial, the government became aware of several findings of fact made by a Massachusetts Probate Court in the course of a civil contempt proceeding brought against Miara by his ex-wife.[12] Appellants claim that these findings indicated that Miara's conduct with respect to his daughter's 1980 federal income tax returns, if proven, would subject him to federal prosecution. Appellants contend that they should have been permitted to cross-examine Miara on these matters to determine whether he was motivated in any way

12. The probate court's findings relied on by appellants were as follows:

"96. In 1980, Richard A. Miara drew paychecks from New England Chain Link Fence Co., Inc., to his daughter, Karen Miara, totaling $4,000.00. (Ex. 47A–No. 60).

97. At trial, Richard A. Miara exercised his rights under the Fifth Amendment with regard to questions put to him concerning the preparation and filing of tax returns and cashing of refund checks in the name of his daughter, Karen Miara, for the year 1980.

98. The defendant had an accountant prepare a tax return for Karen Miara for the year 1980 reporting $4,000.00 in income from New England Chain Link Fence Co., Inc. (Ex. 47B–No. 62 and Ex. 43).

99. Karen Miara did not sign the 1980 federal or state tax returns filed in her name. (Ex. 47B–No. 63).

100. Karen Miara did not sign the state or federal refund checks in the amounts of $22.00 and $225.00 respectively received for the year 1980 as a result of the filing of tax returns in her name. (Ex. 47A–No. 64).

101. Karen Miara turned fifteen years of age on May 28, 1980, and was a full-time student throughout the year 1980."

to curry favor with the prosecution.[13] The court ruled against appellants, pointing out that the probate court findings did not conclusively establish Miara's alleged fraudulent conduct and that a "trial within a trial" would be necessary simply to determine whether Miara even committed the acts which appellants claim constitute bias. In the exercise of its discretion, the court excluded such cross-examination.

▮ We recognize that the right of a defendant in a criminal case to establish the bias of witnesses against him through cross-examination is an important component of the Sixth Amendment right to confrontation. *Davis v. Alaska,* 415 U.S. 308, 315–16 (1974); *United States v. Tracey,* 675 F.2d 433, 437 (1st Cir.1982). Moreover, while it is within the discretion of the trial court, cross-examination by a defendant as to a witness' bias should not be foreclosed at least until a minimum threshold of inquiry has been afforded the defendant. *Id.* Since the court foreclosed all inquiry into the tax matters, appellants claim that it erred as a matter of law. We disagree.

▮ Miara voluntarily commenced cooperation with the government in September 1979. The alleged improprieties in his daughter's tax returns did not occur until 1980. The government did not become aware of the improprieties until September 24, 1982—four days before the trial began. To suggest that Miara's motive in cooperating was to curry favor with the government would be to blind oneself to these facts. Moreover, whether Miara actually committed the alleged improprieties is not important on the issue of bias. What is important is Miara's subjective belief as to whether the government would treat him more favorably because of his testimony. *Tracey, supra,* 675 F.2d at 439. Even if Miara believed at that late date that his cooperation would earn him lenient treatment—a proposition that strikes us as tenuous, when compared with his long period of cooperation with the government, such evidence does not sufficiently give rise to the likelihood of bias as to permit appellants to cross-examine on that issue. *United States v. Hawkins,* 661 F.2d 436, 444 (5th Cir.1981), *cert. denied,* 456 U.S. 991 (1982). The very slight probative value of such evidence on the issue of bias does not overcome the strong likelihood of confusion on the central issues in the case and undue delay in the trial. *Chipman v. Mercer,* 628 F.2d 528, 531 (9th Cir.1980).

We hold that the court properly excluded cross-examination into alleged improprieties on the part of Miara in connection with his daughter's 1980 tax returns.

### (B) *Arsenault's Testimony*

Appellants sought to introduce the testimony of one Albert Arsenault, a former Superintendent of Parks for the City of Fall River. Arsenault's proffered testimony was to the effect that under a prior fence contract between New England Fence and the Community Development Agency of Fall River, New England Fence performed in a sub-standard manner. Specifically, according to Arsenault, New England Fence deviated from the depth and shape specifications of that contract in the same manner as it did under the instant contract. Appellants claim that this testimony would have supported their defense theory that Miara entered into an agreement with certain persons (including the city engineer who had knowledge of New England Fence's past poor performance but nevertheless certified it for the high school fence project) in order to avoid performing according to contract specifications, and that appellants at all times were trying to compel Miara to perform according to the contract. The court excluded the evidence as either completely irrelevant, Fed.R.Evid. 401, or, if relevant, so marginally so that its probative value would be substantially outweighed by confusion of the issues. Fed.R. Evid. 403.

---

**13.** At trial, appellants also contended that these findings were probative on the issue of Miara's credibility—a contention they have abandoned on appeal.

Under either Rule 401 or 403, our review is limited to determining, based on our examination of the record as a whole, whether the court abused its discretion. *United States v. Southard,* 700 F.2d 1, 13 (1st Cir.), *cert. denied,* —— U.S. —— (1983); *United States v. Mehtala,* 578 F.2d 6, 9 (1st Cir.1978). We find no such abuse of discretion here. Whether New England Fence was a quality fence contractor, despite appellants' claim, is not a significant issue in this case. Assuming arguendo that New England Fence did deviate from the contract specifications in the instant case in the same manner as Arsenault asserts it did in the past, that would not be a defense to the crimes for which appellants were indicted and convicted. The issue in the instant case was whether the two appellants misused the power of their offices to induce Miara, out of fear that his relations as a contractor with the City of Fall River would be injured, to pay them $4000 to which they were not entitled. Appellants' claim that Miara may have agreed with the city engineer to do the job in a substandard manner would not excuse or justify in any way the extortionate demands, and the acceptance of the money, of which the appellants were found guilty.

Moreover, even if we were convinced (and we are not) that a showing of relevancy had been made, we agree with the trial court that the time necessary to ascertain the facts and circumstances of that contract two years prior to the instant one, and the concomitant diversion of the jury into the issue of the quality of New England Fence's fence-building, would substantially outweigh any probative value of such evidence.

We hold that the court properly excluded Arsenault's testimony.

## V.

## JURY CHARGE

Appellants challenge the court's jury charge in two respects: first, that, taken as a whole, the charge permitted the jury to convict appellants under the Hobbs Act based on the mere passive receipt of money; and, second, that the charge varied materially from the instructions the court informed counsel, pursuant to Fed.R.Crim.P. 30, would be given.

### (A) *Passive Receipt of Property*

The Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened ... fear, or under color of official right." 18 U.S.C. § 1951(b)(2). The indictment charged appellants with having induced Miara to pay $4000 through "color of official right and by the wrongful use of actual or threatened fear of economic and financial injury" to Miara and New England Fence. Appellants argue that under *United States v. Hathaway,* 534 F.2d 386 (1st Cir.), *cert. denied,* 429 U.S. 819 (1976), the government must have proven beyond a reasonable doubt that appellants induced Miara to make the payments; and that Miara's alleged initiation of payments, combined with appellants' alleged passive receipt thereof, is not sufficient for a Hobbs Act conviction. They contend that the court's instructions permitted the jury to find the latter two facts but nevertheless to convict them under the Hobbs Act.

Preliminarily, it is undisputed that appellants did not object to the charge in this respect at the time of trial; so we must treat their claim as one of plain error. Fed. R.Crim.P. 30; *United States v. Fusaro,* 708 F.2d 17, 22 (1st Cir.), *cert. denied,* —— U.S. —— (1983).

Appellants' claim of error focuses on one particular passage of the charge which deals with the color of official right type of extortion:

"Indeed, under the law, it would be possible for Miara, the person who allegedly

made the payments, to have been the first one to bring up the subject of the payments. It does not follow that the government may not prove that the defendants were guilty of this offense." [14]

Appellants argue that, although this may be a correct statement of law under some circumstances—for example, if the victim is told by an agent of the defendant that a payment must be made in order to secure some benefit, *Hathaway, supra,* or if a general atmosphere or pattern of extortion is well known prior to the victim's suggestion of a payment, *United States v. Margiotta,* 688 F.2d 108 (2d Cir.1982), *cert. denied,* —— U.S. —— (1983); *United States v. Duhon,* 565 F.2d 345 (5th Cir.), *cert. denied,* 435 U.S. 952 (1978)—it is incorrect in this case, so the argument goes, because Miara allegedly suggested a payoff during his very first meeting with Jarabek, having been told nothing to indicate that the latter would demand money.[15]

 We need not decide whether appellants' distinctions make a difference,[16] for we are satisfied, after reviewing the entire charge to the jury, that the passage quoted above could not have had any significant effect on the jury's verdict. At four different points during the charge, the court informed the jury that the government was required to prove beyond a reasonable doubt that appellants induced the pay-

ments. At two separate places, the court informed the jury that the passive receipt of money by appellants, without more, would be insufficient to convict under the Hobbs Act.

We hold that the court did not err in its charge on inducement.

**(B) *Compliance With Rule 30***

 Rule 30 requires the trial court to inform counsel of its proposed action on their written requests to charge prior to summations. This is to allow counsel to conform their arguments to the law. *Fusaro, supra,* 708 F.2d at 22. The court need not repeat in the charge the exact language proposed by counsel. The court may charge in substance if the request is granted. An appellate court will reverse only where fundamental prejudice to the defendant has been shown to have resulted from the court's deviation from a written request to charge which it has indicated would be granted. *United States v. Wander,* 601 F.2d 1251, 1262 (3d Cir.1979).

The indictment here charged appellants with inducing payments under the coercive threat that "Jarabek would misuse the power of his office to interfere with the contractual relations between New England Fence and the City of Fall River, and to influence the disposition of proposed change

---

**14.** The reference to Miara's having initiated the subject of payments arises from his testimony that on September 4, 1979 he asked Jarabek whether anything could be done to "iron things out". Upon cross-examination, Miara gave conflicting answers as to what he meant by that. He repeatedly denied that he was offering a bribe. The government vigorously maintains that Miara never offered a bribe. There was evidence from which the jury could have so found.

**15.** Appellants' argument does not really take into account the fact that, if a bribe was offered, Jarabek rejected it out of hand at that time and the fact that it was Jarabek, through Alecrim, who initiated the discussion of a payoff in the conversation of September 25.

**16.** In *Hathaway* we did not hold that the Hobbs Act requires more than the passive receipt of

money, but rather only that the court's charge in that case did not permit a conviction based upon the mere passive receipt of money. We expressly are not deciding today whether we should join several other circuits which have decided that, in a Hobbs Act prosecution for extortion under color of official right, all that must be shown is that the defendant was a public official who received money to which he was not entitled and by virtue only of his official position. *E.g., United States v. Jannotti,* 673 F.2d 578, 595 (3d Cir.) (en banc), *cert. denied,* 457 U.S. 1106 (1982); *United States v. Barber,* 668 F.2d 778, 783 (4th Cir.), *cert. denied,* —— U.S. —— (1982); *United States v. Hedman,* 630 F.2d 1184, 1195 (7th Cir.1980), *cert. denied,* 450 U.S. 965 (1981).

We leave for another day whether to join the other circuits on this issue.

orders ...." [17] On the ninth day of the ten day trial, the court told counsel that he would charge .that the jury would be required under the indictment, in order to convict, to find that Miara believed that "unless he paid the money his company wasn't going to be able to perform the job, at least the way it was entitled to, absent official interference." [18] In its charge to the jury, the court stated the issue as "whether Miara believed reasonably that the defendants could *help him* or hurt him in his dealings with the City of Fall River and in the performance of his contract...." (emphasis added).

Appellants' argument, as we understand it, is that the emphasized language permitted a conviction if the jury found any interference with Miara's relations with Fall River, whereas they understood the proposed instructions to refer only to interference with Miara's legitimate contract rights. They argued to the jury that they were interfering only with Miara's attempt to perform the contract improperly, which they say would not have been grounds to convict under the proposed instructions.

██ We agree that the jury charge permitted a conviction based on a finding of interference with the relations between Fall River and New England Fence. That is what the Hobbs Act proscribes and exactly what the indictment charged. Defense

counsel chose to latch on to a parenthetical remark made in a summary of the proposed instructions and to base his argument on interference exclusively on that remark. What was overlooked is that the indictment also charged the misuse of power to influence the disposition of the change orders. That clearly includes "helping" Miara in his relations with Fall River.

██ We find appellants' argument to be based essentially on semantics. We hold that the court's charge on interference through misuse of the power of appellants' office was in substantial compliance with the proposed instructions of which counsel had been informed. Appellants were in no way prejudiced by whatever slight variance they claim to have occurred.[19]

## VI.

## MOTIONS FOR JUDGMENTS OF ACQUITTAL

Appellants' final claim of error is that the court erred in denying their motions for judgments of acquittal at the close of the government's evidence, at the close of all of the evidence and after discharge of the jury. Each motion challenges the sufficiency of the evidence to support convictions under the Hobbs Act.

---

17. Appellants also claim substantial variance in the charge on inducement, i.e. variance from the way in which the court indicated it would charge on the subject. Since we have held that the charge as a whole accurately stated the law on inducement, we find no merit in appellants' claim of variance. Taking what appellants apparently consider the most serious variation, the court informed counsel that the jury would be told that they had to find "that the payment was induced in the sense of initiated" by appellants. They contend that during the charge the court instructed the jury that it did not matter who initiated the transaction. The court never said that who initiated the transaction did not matter. What the court did say was that the jury could convict even if it found that Miara first brought up the subject of payments. Taken in the context of the entire charge, this statement did not relieve the jury of finding that appellants nevertheless induced Miara to think that payments were expected. We hold that there was no variance and no prejudice.

Moreover, appellants insist on evaluating the evidence in the light most favorable to themselves. The law is precisely the contrary at this stage of the proceedings. Viewed in the light most favorable to the government, the evidence established that Miara never brought up the subject of payments on his own before Alecrim first mentioned it on September 25.

18. It appears that the court said this in the context of the fear of economic injury type of extortion. The statement in the charge of which appellants complain occurred in the course of the instruction on the color of official right type of extortion. We assume, that, since the court used the phrase "absent official interference", it intended the instruction to apply to the color of official right prong of extortion.

19. For these reasons, we hold that the court's charge to the jury did not constructively amend the indictment, as appellants claim.

Based on our careful review of all of the evidence, much of which has been set forth in detail in this opinion, and viewing the evidence in the light most favorable to the government, as we must at this stage of the proceedings, *United States v. Glasser,* 315 U.S. 60, 80 (1942), we are satisfied that there was more than sufficient evidence to support the conviction of each appellant under each count of the indictment.

We hold that the court did not err in denying appellants' motions for judgments of acquittal.

Appellants were convicted more than a year ago after a fair trial and after a fair pretrial suppression motion hearing. They were charged with serious crimes committed nearly five years ago. We order that the mandate issue forthwith.

*Affirmed.*