Elbert STALLWORTH,
Plaintiff-Appellant,

v.

ILLINOIS CENTRAL GULF RAILROAD,
Defendant-Appellee.

No. 81–7459.

United States Court of Appeals,
Eleventh Circuit.

Nov. 1, 1982.

---

Melvin W. Brunson, Mobile, Ala., for plaintiff-appellant.

Wesley Pipes, Sam W. Pipes, Mobile, Ala., for defendant-appellee.

Before GODBOLD, Chief Judge, MERRITT * and HENDERSON, Circuit Judges.

GODBOLD, Chief Judge:

Appellant Stallworth drove his automobile into an Illinois Central Gulf Railroad locomotive at approximately 2:30 a.m. the morning of January 8, 1980 at a crossing in Mobile, Alabama. He sued the railroad on the theories of negligence and wantonness in Alabama state court. The railroad removed to federal court based upon diversity. In the jury trial the district court refused to allow Stallworth to introduce evidence regarding placement of flares by the railroad at the crossing immediately after the accident. At the close of Stallworth's evidence the court directed a verdict for the railroad on all counts. Stallworth appeals, raising the exclusion of the evidence of the flares and the directed verdict.

## I. Facts

We present the facts in the light most favorable to Stallworth. *See Boeing Company v. Shipman,* 411 F.2d 365, 373–76 (5th Cir. 1969) (en banc).[1] Most of the facts are not disputed.

Conception Street Road ("Conception Street") is a two-lane, asphalt road within the city limits of Mobile. The road is straight for one-half mile on either side of the railroad tracks. To the west of Conception Street lies "a very heavy marshy area, and on the east side there is a railroad track and an area where . . . trains come into the State Dock area. . . ."[2] The testimony and photographs in evidence indicate that Conception Street is very dark at night. It is bordered by trees and shrubs, and there are no streetlights, no lights at the railroad crossing, and no buildings in close proximity to it. The night of the accident the road was covered with fog. Witnesses described weather conditions as: "exceptionally foggy," "very foggy in patches," "very, very foggy and the streets were sort of damp from the fog."[3]

The only warning of the railroad crossing was a crossbuck sign. There were no automatic devices, no lights, no bells, no other

---

* Honorable Gilbert S. Merritt, U. S. Circuit Judge for the Sixth Circuit, sitting by designation.

1. Fifth Circuit cases handed down prior to September 30, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir. 1981) (en banc).

2. Testimony of Officer Skanes of the Mobile Police Department.

3. Testimony of Officers Skanes and Neno, of the Mobile Police Department, and of Stallworth. Thompson, an employee of the railroad, testified that there was no fog at the time of the accident but that "it sort of rolled in there" after the accident.

signs,[4] and no railroad pavement markings.[5] The crossbuck sign did not serve its function well. The function of a crossbuck is to alert travelers to the presence of a railroad crossing, not necessarily to the presence of trains on the crossing. A crossbuck in good condition consists of an 11-foot pole with two four-foot boards crossing to form an "X" near the top of the pole. On one board is the word "RAILROAD" and on the other the word "CROSSING." The crossbuck should have a white background and black lettering, and the paint and lettering should be illuminated or reflectorized. The crossbuck sign, of course, should stand straight.[6]

The crossbuck at the railroad crossing leaned away from the street. The board with "RAILROAD" on it had fallen off years earlier. Most of the original paint had weathered away. If examined closely, the letters "R O S I N G" could be deciphered. In a deposition read at trial, Knight, a railroad employee familiar with the railroad's crossbuck specifications, gave as his opinion that the crossbuck was in poor condition and should be replaced. Officer Skanes, driving north on Conception Street on a clear night some time during the month following the accident, could not see the crossbuck until he was within 30 feet of it. The condition of the crossbuck and the thick brush surrounding it made the sign difficult to spot even though Skanes was specifically looking for it.

The railroad does not regularly inspect crossbuck signs, but it will inspect a sign if an employee or a citizen reports one as being in bad condition. According to the railroad, the crossbuck on Conception Street had never been reported as being in bad condition.

Having set the scene, we now review the activity surrounding the accident. The Conception Street crossing was used approximately once a day for switching maneuvers. Thompson, switchman for the railroad, testified that the track crossing Conception Street was a "Y" used for railroad yard switching maneuvers. The "Y" was used the night of the accident to turn four locomotives around. The four locomotives entered the crossing from the south leg of the "Y." Once across the road the train reversed its direction, recrossed the road, and exited on the north leg of the "Y."

Thompson's job was to give signals (go ahead, back up, stop) to the engineer with a radio or a lantern. Going into the "Y" Thompson was on the first locomotive, the engineer on the fourth one. As the train approached the crossing Thompson walked into the middle of the street. Seeing no cars, he radioed to the engineer to back up. The train backed across the road. After the tracks were switched and aligned to allow the locomotives to exit on the north leg of the "Y," the train pulled up to the crossing and stopped. Thompson walked to the middle of the road to check for oncoming traffic. He saw no cars and gave the engineer the go ahead signal with his lantern. The engineer blew the whistle and started back across the road, and Thompson mounted the first locomotive, the one the engineer was on. The locomotive moved

**4.** Officer Skanes testified that on a clear night in the month following the accident he drove up Conception Street. He saw an illuminated advance warning sign (a round sign displaying an "X" and "Railroad") 25 to 30 feet up the road from the crossbuck. The sign was visible from a distance of 50 feet. Stallworth testified the advance warning sign was not there the night of the accident.

**5.** Photographs of Conception Street reveal a solid yellow center stripe bordered on the left by two broken center lines, one yellow and one white. The photographs also show a large white "X" with an "R" on either side of the "X" painted on the right half of the road just

south of the railroad crossing. Stallworth testified that the yellow lines and the white railroad crossing sign were not there the night of the accident. No one at trial testified as to the date the photographs were taken. Stallworth, however, stated that the photographs were taken "much after the accident."

**6.** This description of the crossbuck sign is taken from the deposition of Knight, which was read at trial, and an exhibit detailing the railroad's crossbuck specifications. The description is included to explain what a crossbuck sign is, not to establish a minimum or maximum standard for adequate crossbuck design.

across the road at 3–4 miles per hour. Just before he cleared the crossing Thompson looked up and saw two headlights coming around a curve on Conception Street. He did not contemplate the matter further until he heard a skid and felt a bump as Stallworth's car collided with the third locomotive. When asked why he did not stay in the road to flag approaching cars and then board the last locomotive, Thompson replied: "[M]y job is to stay up there with the engineer. That's my responsibility. There would be something on the track or a broken track, and if something happened, it would be my job out the window." Thompson did not notice the condition of the crossbuck. He stated that it was not his responsibility to look for and report signs in need of repair.[7]

The final participant in this scenario is Stallworth. The night of the accident he worked from 4:00 p.m. to 12:30 a.m., then went to the residence of a friend, left there about 2:00 a.m., and started home.

Stallworth entered Conception Street at a curve about a half mile from the railroad crossing. He was familiar with the road, having driven this route to and from work about half the time for 13 years. Stallworth testified:

> It is dark ordinarily on this street and very hard to see, and I was looking more or less for some sort of sign to show me where I am all the time, but particularly when I get to the area when I know where the railroad crossing should be I am looking for a sign for there.
>
> . . . .
>
> I sit up sort of straight in my car because it was kind of hard to see and I was leaning forward towards the steering column and driving slow enough to try to pick my way through the fog and look for the railroad crossing sign, or the bad spot in the side of the road or whatever I could see to give me a sign of how close I was to the track. But, it was really hard to pick up anything right there.

When Stallworth entered Conception Street he was traveling approximately 25–30 miles per hour. He released his foot from the gas pedal in anticipation of slowing down further. Stallworth could see no traffic on the road. He looked for the crossbuck sign, aware of both its presence and its condition, but never saw it. He continued down the street, headlights on low beam, window down, and radio on.

On direct examination Stallworth testified:

> I didn't realize how close I was to the tracks until I was right up on them and saw the train. Like I said already, I released the gas pedal altogether and I reached for the brakes and applied the brakes. And I tried to make an effort to steer over into a ditch instead of the train. When I could see the train, it blended into the darkness so well, it was the same color of the night and no lightings or markings on it, and no paint that I could see.

On cross-examination, he repeated his story,

> When I first saw the train, it was a matter of feet. It was just invisible in the dark. [The locomotive was the] same color as the night to me. Just a dark faded color, black or dark gray or whatever. It just seemed to blend into the night. I didn't look at it very long, though. I went right into it.

Q [by the railroad's counsel] Mr. Stallworth, as you were driving down that road that night and expecting to stop at a railroad crossing, how did you plan to stop your automobile within sight of the sign if you were going so fast that you could not stop without hitting the locomotive?

A I expected to see the sign much earlier than I saw the train.

Q The locomotive is considerably larger than the sign, isn't it?

A Yes, sir. The locomotive was the same color or blending into the night. I thought the sign would stand out somewhat. It should have been white. It should have stood out a little bit.

---

7. The other three members of the railroad crew did not testify.

At the close of Stallworth's case in chief the railroad moved for a directed verdict on the entire case and on each cause of action. The court directed a verdict for the railroad, holding that the facts did not justify a finding of wantonness and that Stallworth was contributorily negligent as a matter of law.

## II. Wantonness

In Alabama contributory negligence is a complete defense in a negligence action. Contributory negligence, however, will not defeat a claim of wantonness. *Golden v. McCurry,* 392 So.2d 815, 817 (Ala.1980) (per curiam) (refusing to adopt a rule of comparative negligence).

> Wantonness is a conscious doing of some act or omission of some duty under knowledge of existing conditions and conscious that from the doing of such act or omission of such duty injury will likely or probably result. Before a party could be said to be guilty of wanton conduct it must be shown that with reckless indifference to the consequences he consciously and intentionally did some wrongful act or omitted some known duty which produced the injury.

*English v. Jacobs,* 263 Ala. 376, 82 So.2d 542, 544 (1955) quoting *Duke v. Gaines,* 224 Ala. 519–20, 140 So. 600, 601 (1932). "[I]t is wantonness when one has knowledge that another (any person) is likely to be in a position of danger and with conscious disregard of such known danger proceeds on a dangerous course which causes the disaster, though he may not know whether any person is actually in danger." *Graves v. Wildsmith,* 278 Ala. 228, 177 So.2d 448, 452 (1965).

Knowledge of a condition and consciousness of the danger may be inferred. *Myers v. Evans,* 287 Ala. 710, 255 So.2d 581, 583 (1971). Under all circumstances, however, wanton conduct requires knowledge of the conditions that make an act likely to result in injury and a consciousness of the danger. *Graves, supra,* 177 So.2d at 452. Negligence in the failure to have that knowledge and consciousness will not support a claim of wantonness. *Id.*

Wantonness differs from negligence according to the mental state of the actor. Wantonness, unlike negligence, requires both knowledge and consciousness that an act or omission will likely result in injury to another. *Thompson v. White,* 274 Ala. 413, 149 So.2d 797, 804 (1963). Wantonness differs from intentional injury in that intentional injury requires both a knowledge of the danger and a design or purpose to inflict injury. *Central of Georgia Railway v. Corbitt,* 218 Ala. 410, 118 So. 755, 756 (1928). To constitute wantonness the design or purpose may be absent, and the injury inadvertent, if the act is done in reckless disregard of its probable consequences. *English v. Jacobs,* 82 So.2d 542, 545.

The application of the legal principles of wantonness to the factual situation in each case must control, *Trahan v. Cook,* 288 Ala. 704, 265 So.2d 125, 128 (1972), a determination usually for a jury unless reasonable persons in the exercise of impartial judgment could not reach different conclusions. *Kaye v. Pawnee Construction Co.,* 680 F.2d 1360, 1365 (11th Cir. 1982); *Boeing Company v. Shipman,* 411 F.2d 365 (5th Cir. 1969) (en banc); *Myers v. Evans,* 287 Ala. 710, 712, 255 So.2d 581, 582–83 (1971). On appeal Stallworth argues that there was a jury issue on wantonness because the railroad crew had knowledge of the condition of the crossbuck sign and the inclement weather, and this knowledge made the crew conscious that injury was likely to result from failure to provide a special warning.

The facts, with inferences favorable to Stallworth, do not make a jury issue. Stallworth refers to the knowledge of the "railroad crew," but the evidence related solely to knowledge by Thompson, who did not know of the crossbuck's condition or of the lack of any other warnings. Thompson and the railroad may have been negligent, but negligence in not appreciating the dangerousness of the conditions is not wantonness. *Graves,* 177 So.2d at 452. Moreover, knowledge of the inclement weather is insufficient if Thompson was not conscious of the harm that would likely occur. *English v.*

*Jacobs,* 82 So.2d at 545. According to Thompson's uncontradicted testimony, he was on the train as it was crossing the road when he glanced up to see headlights coming around the curve. He then went about his duties, making sure the track ahead was unbroken and free of debris. Thompson did not realize the significance of the headlights until he heard a skid and felt a bump. This did not constitute wantonness.

### III. Contributory negligence

In directing a verdict in favor of the railroad the court found that Alabama law imposes an absolute duty on the operators of motor vehicles to stop, look and listen at railroad crossings. According to the court, the only exception to the stop, look and listen rule arises if the driver did not know the crossing existed. Since Stallworth was familiar with the crossing, the court held that he was contributorily negligent as a matter of law.

We hold that Alabama does not impose an absolute duty to stop, look and listen. The district court erred in removing the issue of Stallworth's negligence from the jury's consideration. We also hold that Stallworth was not contributorily negligent as a matter of law because he was unable to stop his automobile within a distance equal to the range of his vision and because he was traveling in excess of 15 miles per hour when approaching the crossing.

### A. Stop, look and listen

A reasonable jury could have found that Stallworth looked and listened for a train. It is undisputed that he did not stop. We must, then, inquire whether Alabama law imposes an absolute duty to stop if the driver is familiar with the crossing, and, if there is no absolute duty, whether a reasonable jury could find that Stallworth was not negligent in failing to stop at the crossing.

The Alabama Supreme Court has repeatedly held that "the 'stop, look and listen' rule is not hard, fast or absolute in its application." *Alabama Great Southern Railroad v. Johnston,* 281 Ala. 140, 199 So.2d 840, 848 (1967) (verdict in favor of plaintiff reversed; case remanded for new trial; plaintiff familiar with crossing). "It cannot be affirmed as a matter of law in every case and under all circumstances that there is an absolute duty to stop, look and listen before a traveler may go on a railroad crossing." *Southern Railway v. Carter,* 276 Ala. 218, 160 So.2d 628, 632–33 (1964) (per curiam) (affirmed jury finding of no contributory negligence; plaintiff familiar with crossing). *See e.g., McCullough v. L&N Railroad,* 396 So.2d 683, 686 (Ala.1981) (case submitted to jury; plaintiff familiar with crossing); *Cunningham Hardware Co. v. Louisville & Nashville Railroad,* 209 Ala. 327, 332, 96 So. 358, 363 (1923) (driver relied on flagman; driver familiar with crossing; case remanded for trial); *Central of Georgia Railway v. Hyatt,* 151 Ala. 355, 364, 43 So. 867, 871 (1907) (charges properly refused because they "assume as matter of law that it was the imperative duty of the intestate to stop and look and listen, and that his failure to do so was negligence, when it was, we think, a question for the jury to determine whether or not it was his duty").

The rule in Alabama is that "a traveler is bound to use ordinary care and prudence to discover the approach of trains, there being no hard and fast rule as to what constitutes contributory negligence." *McCullough, supra,* 396 So.2d at 686. The Alabama law was articulated in *Louisville & Nashville Railroad v. Williams,* 172 Ala. 560, 577, 55 So. 218, 223 (1911):

> What is, or is not, ordinary care often depends upon the facts of the particular case. The rule, 'stop, look and listen;' is not arbitrary or invariable as to time and place. It may depend in some measure upon the familiarity of the passenger with the place of crossing; and he cannot always be said to be guilty of contributory negligence, because he failed to stop, look or listen at one particular time or place, rather than at another.
>
> . . . .
>
> While it cannot be justly affirmed, as we believe, as matter of law, that there is a duty to stop in all cases, yet there are cases where the failure to stop must be deemed such a breach of duty as will

defeat a recovery by the plaintiff. There are very many cases holding that the surroundings may be such as to impose upon the traveler the duty of stopping, looking, and listening, and these cases, as we think, assert the true doctrine. Some of the courts, in well-reasoned cases, press the rule further, and hold that the traveler must, in all cases, stop, look and listen. As we have said, we do not think that it can justly be affirmed, as matter of law, that there is a duty to stop in all cases, but we do think that the duty exists in cases where there is an obstruction to sight or hearing, and that where the surroundings are such that but one conclusion can be reasonably drawn—and that conclusion is that it is negligence to proceed without halting—the court should without hesitation direct a verdict, if no halt is made. In the majority of cases, however, the question is one of fact, or a mixed question of law and fact, rather than a pure question of law.

We now consider whether a reasonable jury could find that Stallworth's failure to stop at the Conception Street crossing was not negligent. A railroad track itself is warning of danger. *McCullough,* 396 So.2d at 686. The general rule is that a motorist has a duty to stop, look and listen before crossing a railroad track. *Williams,* 55 So. 218. An exception arises when the evidence is such that a reasonable jury could determine that some peculiar environment or hazardous condition made the failure to stop not negligent. *Johnston,* 199 So.2d 840; *Callaway v. Adams,* 252 Ala. 136, 40 So.2d 73 (1949).

An examination of three cases aids us in determining whether the question of Stallworth's negligence should have been left to the jury. In *Lambeth v. Gulf, Mobile & Ohio Railroad,* 273 Ala. 387, 141 So.2d 170 (1962),

[t]he evidence showed that the accident occurred about 10:00 p.m. on a clear night when the appellant had a clear view of the crossing several hundred yards before reaching it; there was no fog or smoke or anything to obstruct his vision; although he was not a regular traveler on that road, he traveled it about twice a year, had been over it four or five months previously, and knew that the track was there. There was a gradual curve in the road but there was a straight stretch of road for a considerable distance before reaching the crossing. Some considerable distance from the crossing there was a circular warning sign, plainly visible, bearing the letters 'R/R'. In addition to this sign, also visible for a considerable distance from the track, there were two 'crossbuck' signs and an Alabama 'Stop' sign. Appellant testified he knew these signs were warnings of a railroad crossing, but claimed he did not notice them, but instead was traveling about 40 to 45 miles per hour and did not reduce his speed until within about 38 feet of the train, when he first saw it on the track blocking the crossing, which was too late to avert the crash. . . .

. . . .

Appellant argues that the rule of *Callaway v. Adams,* 252 Ala. 136, 40 So.2d 73, controls the instant situation. That case, however, is without influence here. There, because of the peculiar environment surrounding the railroad crossing, special conditions of hazard such as the topography and grade and course of the highway and overhanging tree limbs obstructing the signal light, the presence of the train could not, by the exercise of reasonable care, be discovered until immediately upon it, thus disclosing an environment producing such special circumstances or conditions of hazard as made it a jury question as to whether or not the railroad company was guilty of negligence, and whether or not plaintiff—a stranger to the situation—was guilty of contributory negligence. Here, however, no conditions of hazard and no peculiar environment confronted the plaintiff. Clearly then, the *Callaway v. Adams* case, *supra,* is inapplicable.

*Id.* 141 So.2d at 171–72.

In *Johnston,* 199 So.2d 840, plaintiff's intestate drove his automobile into a moving train on a public crossing.

This collision occurred ... between 11:00 p. m. and midnight, June 19, 1966. Plaintiff's intestate was driving an automobile in a generally westerly direction along Hale County Road No. 46. The automobile struck the 88th railroad car of a northbound freight train which was about two miles long, counting 100 cars to a mile....

The road running west toward the crossing, the direction deceased was traveling, was asphalt and it curved to the driver's right. There was a highway sign on the right of the road and a luminous crossbuck sign on the left near the tracks and a stop sign on the right near the crossing. Skid marks extended back east 90 feet from the crossing and showed that the automobile was on the left side of the center line of the highway while the skid marks were being made. One of the State Troopers who investigated the accident stated that he had an unobstructed view of the crossing for 300 to 350 feet and that he saw the signs. Based upon his experience and training as a State Trooper, the skid marks, the impact and the condition of the vehicle, he estimated the speed of the automobile at 80 miles per hour.

A State Toxicologist testified that he analyzed some blood shown by the testimony to have been taken from the deceased and found that the degree of intoxication was .20 per cent, which meant that a person with that much alcohol in his blood would be "sloppy drunk."

*Id.* 199 So.2d at 845–46. The court found ample evidence demonstrating that decedent knew the crossing existed and was familiar with it. Evidence indicating that foliage obscured the warning signs and that trees and grass were growing on the right of way in the direction from which the train was coming was sufficient to create a jury question concerning the duty to stop, look and listen. The Alabama Supreme Court found no error in the trial court's ruling that the decedent was not contributorily negligent as a matter of law.[8]

8. Despite this conclusion on contributory negligence, the court, after commenting upon evidence of the decedent's misconduct (speed,

In *McCullough,* 396 So.2d 683, a log truck collided with a train at a public crossing after failing to stop before entering the crossing. The accident occurred in the daytime, the driver was familiar with the crossing and warning signs were posted. In affirming a jury verdict for the defendant, the Alabama Supreme Court stated:

> The evidence in this case conflicted. The plaintiff's theory was that the automatic signal device was not operating until after the accident. This view was sharply disputed by numerous defense witnesses. The plaintiff himself testified that he slowed his truck to fourteen miles per hour but didn't stop before he got to the track. The circumstances of the collision, the presence of warning signs on the highway, and the disputed evidence of lights flashing, bells ringing, and whistle blowing, made an issue of contributory negligence for the jury.

*Id.* 396 So.2d at 686.

*Lambeth,* 141 So.2d 170, reiterates the general rule: A person attempting to cross a railroad track has a duty to stop, look and listen. The exception acknowledged in *Lambeth,* and illustrated in *Callaway,* 40 So.2d 73; *Johnston,* 199 So.2d 840; and *McCullough,* 396 So.2d 683, arises when some peculiar environment or hazardous condition confronts the driver. The unusual topograph in *Callaway,* the distracting trees and foliage in *Johnston,* and the disputed failure of the automatic signal device in *McCullough* brought the issue of the driver's negligence within the province of the jury.

Turning to the case at bar, a reasonable jury could find that the darkness, the foggy weather, the poor condition of the crossbuck and the absence of other warning devices created a peculiar environment or hazardous condition that made Stallworth's failure to stop not negligent. The court, therefore, erred in refusing to allow the jury to determine the issue of Stallworth's negligence.

skid marks, blood alcohol level) held that defendant's motion for a new trial should have been granted. *Johnston,* 199 So.2d at 848.

The railroad argues that *Sloss-Sheffield Steel & Iron Co. v. Littrell,* 246 Ala. 58, 18 So.2d 709 (1944), should control our decision. In *Littrell* the plaintiff was driving on a familiar road when he collided with a train at a public crossing. Although the collision occurred at night and no warning signs were posted, the court found the plaintiff contributorily negligent as a matter of law for failing to stop, look and listen. The facts of *Littrell* are similar to the facts before us. The foggy weather, however, in conjunction with the other factors set forth above would permit a reasonable jury to conclude that hazardous conditions made the failure to stop not negligent. *Littrell* is therefore distinguishable. Under the facts of the present case the issue of contributory negligence should have been left to the jury.

### B. Ability to stop within the range of vision

■ The railroad argues that Stallworth was negligent as a matter of law because he was driving too fast to stop within the range of his vision. Under the testimony the jury could find that by the time Stallworth could see the locomotive he was unable to stop in time to avoid the collision.

It is unclear whether Alabama recognizes any range of vision rule. In *Lambeth,* 141 So.2d 170, the Alabama Supreme Court noted that the plaintiff "was traveling about 40 to 45 miles per hour and did not reduce his speed until within about 38 feet of the train, when he first saw it on the track blocking the crossing, which was too late to avert the crash; he knew he should not override his lights, meaning 'drive so fast that you can't see an object in time to stop'...." *Id.* 141 So.2d at 171. (the court went on to find the plaintiff contributorily negligent as a matter of law due to his failure to stop, look and listen before attempting to cross the railroad tracks). *Lambeth* suggests that a driver may have a duty to be able to stop within his range of vision. Recent caselaw indicates that, to the extent this duty exists, its application should probably be left to the jury. *McKinney v. Alabama Power Co.,* 414 So.2d 938

(Ala.1982) (defendant collided with car stopped to make left turn; jury verdict for defendant affirmed).

Whatever the Alabama rule may be in other contexts, the cases recognizing exceptions to the stop, look and listen rule at railroad crossings implicitly recognize similar exceptions to any range of vision rule. Under Alabama law, Stallworth's failure to stop, look and listen did not constitute negligence as a matter of law. *See* discussion Part III A, *supra.* The caselaw supporting this finding indicates that under the facts of the present case Stallworth's inability to stop within his range of vision should not be considered negligence as a matter of law. *See McCullough,* 396 So.2d 683; *Johnston,* 199 So.2d 840; *Callaway,* 40 So.2d 73.

### C. Violation of statutory speed restrictions

The Alabama Code provides:

(a) Any person driving a vehicle on a highway shall drive the same at a careful and prudent speed not greater than is reasonable and proper, having due regard to the traffic, surface and width of the highway and of any other conditions then existing and no person shall drive any vehicle upon a highway at such a speed as to endanger the life, limb or property of any person.

(b) Subject to the provisions of subsection (a) of this section and except in those instances where a lower speed is specified, it shall be prima facie lawful for the driver of a vehicle to drive the same at a speed not exceeding the following, but in any case when such speed would be unsafe it shall not be lawful:

(1) Fifteen miles an hour when approaching within 50 feet of a grade crossing of any railroad or street railway when the driver's view is obstructed. A driver's view shall be deemed obstructed when at any time during the last 200 feet of his approach to such crossing, he does not have a clear and uninterrupted view of such approach to such crossing and of any traffic on any such railway for a distance of 400 feet in each direction from such crossing.

. . . .

(4) Fifteen miles an hour in traversing or going around curves or traversing a grade upon a highway when the driver's view is obstructed within a distance of 100 feet along such highway in the direction in which he is proceeding.

Ala.Code § 32–5–91 (1975).[9]

■■■ According to Stallworth's testimony he was traveling 20 to 25 miles per hour, 25 to 30 feet from the crossing when he first sighted the train. Stallworth's violation of § 32–5–91 did not constitute negligence as a matter of law. Compliance with the statute is prima facie lawful but speeds exceeding the statutory limit may or may not be lawful depending on existing conditions. *Fox v. Bartholf,* 374 So.2d 294, 295 (Ala.1979); *Horton v. Mobile Cab & Baggage Co.,* 281 Ala. 35, 198 So.2d 619, 623 (1967). Whether in fact the statute is violated is normally a jury question. *Fox,* 374 So.2d at 295; *Horton,* 198 So.2d at 623.

## IV. The railroad's negligence

The district court erred in finding Stallworth contributorily negligent as a matter of law. The directed verdict in favor of the railroad may nevertheless be affirmed if as a matter of law the railroad did not act negligently.

■■■ The general duty of a railroad to warn of a crossing is stated in *Southern Railway v. Lambeth,* 230 Ala. 162, 160 So. 262 (1935):

[I]n the absence of statute, or special conditions of hazard to motorists, there is no duty on the railway company to provide special warning or safeguards to motorists, either in the day or nighttime, to prevent collisions with cars standing on such crossing. The law requires motorcars to be equipped with adequate headlights, and that they be not run at such speed that an obstruction, such as a freight car, cannot be discovered in time to come to a stop.

*Id.* 160 So. at 263. Thus, a train itself, present in the crossing, is sufficient warning to travelers that they must exercise caution. The presence of the train, however, does not relieve the railroad of the duty to warn under all circumstances. Some peculiar environment or hazardous condition may create a duty on the part of the railroad to provide special warnings. *Louisville & Nashville Railroad v. Byrd,* 298 F.2d 586, 590 (5th Cir. 1962). *See Johnston,* 199 So.2d 840; *Callaway,* 40 So.2d 73. There is sufficient evidence in this case of a peculiar environment or hazardous condition to warrant submission to the jury of the issue of the railroad's negligence. *See* discussion part III A, *supra.*

## V. Evidentiary ruling

■■■ Immediately following the collision the railroad placed flares at the crossing. At trial the railroad moved to exclude evidence of the flares, based upon Fed.R.Evid. 407:

When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

Stallworth argued that evidence of the flares was admissible either to show the feasibility of remedial measures or for impeachment.

The district court ruled that evidence of the flares was not admissible under rule 407 because its probative value was substantially outweighed by the danger of unfair prejudice or confusing the jury. Fed.R.Evid. 403.

The trial court has broad discretion under rule 403. *King v. Ford Motor Co.,* 597 F.2d 436, 445 (5th Cir. 1979). We may not dis-

---

**9.** Section 32 5 91 was in effect at the time this cause of action arose. The statute was subse- quently repealed by 1980 Ala. Acts, No. 80–434, § 15–106, effective May 19, 1980.

turb the court's ruling unless the judge has clearly abused his discretion, *United States v. Johnson,* 558 F.2d 744, 746 (5th Cir. 1977) *cert. denied,* 434 U.S. 1065, 98 S.Ct. 1241, 55 L.Ed.2d 766 (1978); *United States v. Dwyer,* 539 F.2d 924, 927 (2d Cir. 1976), and we perceive no abuse here.

REVERSED and REMANDED.