**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Julita De PARIAS, Jessie Ramirez, a/k/a Marzelo Romdom, a/k/a Norbey Duque Garcia and "Jessid", Defendants-Appellants.**

No. 85–5683.

United States Court of Appeals,
Eleventh Circuit.

Dec. 15, 1986.

Corrected Opinion

Sheryl J. Lowenthal, Coral Gables, Fla., for Ramirez.

Margaret Brodsky, Miami, Fla., for De Parias.

Leon D. Kellner, U.S. Atty., Gregory Kehoe, Asst. U.S. Atty., Miami, Fla., for U.S.

Before JOHNSON and ANDERSON, Circuit Judges, and GARZA *, Senior Circuit Judge.

JOHNSON, Circuit Judge:

## I

## FACTS

This case involves an appeal by two codefendants—Julita De Parias and Jessie Ramirez—from a judgment entered on a conviction of conspiracy to commit extortion and of extortion, in violation of 18 U.S.C.A. §§ 1951 and 2.

On August 7, 1984, Julita De Parias, Jessie Ramirez and Julio De Parias kidnapped Mario Portela, the son of Jesus Portela. Jesus Portela is the president and owner of P & D Developers, Inc., a housing construction company engaged in interstate commerce. The kidnapping was in revenge for an "insult" that Jesus Portela had inflicted on the De Pariases' sister Lenore. Lenore had bought a condominium from P & D Developers but subsequently sought to revoke her sales contract because she thought the interest rate was too high. Jesus Portela supposedly insulted her when he refused to revoke the contract even though she brandished a gun before him.

Over the next few days, Jesus Portela received a number of calls demanding a ransom. He finally agreed to pay a $1,000,000 ransom. Although Jesus Portela provided a small portion of the ransom from his personal assets, nearly $500,000 came from the assets of P & D Developers. P & D Developers borrowed the remaining $500,000 from PAS Developers, Inc., a construction company owned by Mario Portela's father-in-law. Jesus Portela assumed no personal liability for the funds from either P & D Developers or PAS Developers. The drop-off was unsuccessful because Jesus Portela was unable to drive his car into the rear parking lot of the El Viajante Restaurant as instructed to make the drop-off.

After the aborted drop-off, the three elicited the help of Hector De Parias. Hector De Parias guarded Mario Portela in a southwest Miami apartment while the others devised arrangements for a new drop-off. However, they never recontacted Jesus Portela, and after several days, Ramirez decided to kill Mario Portela. Ramirez completely wrapped Mario Portela's head in duct tape and beat his head with a

* Honorable Reynaldo G. Garza, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

chinning bar as he suffocated. After dumping the body in a ditch, Julita De Parias, Jessie Ramirez and Hector De Parias fled Florida but were eventually apprehended in Los Angeles. Julio De Parias has not been apprehended.

Defendants Julita De Parias and Jessie Ramirez were indicted for conspiracy to commit extortion and for extortion under the Hobbs Act. They made several pretrial motions to suppress evidence which were denied. The jury convicted them on both counts. They each were imprisoned for two consecutive twenty-year sentences and were fined $20,000.

## II

## DISCUSSION

### A. Jurisdiction

We first discuss whether federal jurisdiction exists over the kidnapping and demand for ransom. Conviction under the Hobbs Act requires proof of three elements: (1) that the defendant coerced the victim to part with property; (2) that the coercion occurred through the "wrongful use of actual or threatened force, violence or fear or under color of official right"; and (3) that the coercion occurred in such a way as to affect adversely interstate commerce. *United States v. Smalley*, 754 F.2d 944, 947 (11th Cir.1985). The defendants contend that the government failed to establish the third element—the nexus between the extortion and interstate commerce. They argue that Jesus Portela, and not P & D Developers, was the object of the extortion; therefore, no federal jurisdiction exists over the charged activity.

A kidnapping and a subsequent demand for ransom from individuals can affect interstate commerce sufficiently to invoke the Hobbs Act. For example, in *United States v. Carpenter*, 611 F.2d 113, 114–15 (5th Cir.) *cert. denied*, 447 U.S. 922, 100 S.Ct. 3013, 65 L.Ed.2d 1114 (1980), the defendants kidnapped the son of the presi-

dent and vice-president of a bank. Although the defendants demanded ransom from the parents, the fact that a large ransom was demanded, that the parents as officers of the bank had access to the bank's funds, and that the bank's assets were used to pay the ransom established that both the parents and the bank were the object of the extortion. In such circumstances, jurisdiction under the Hobbs Act existed. Similarly in *United States v. Johnson*, 516 F.2d 209, 214–15 (8th Cir.), *cert. denied*, 423 U.S. 859, 96 S.Ct. 112, 46 L.Ed.2d 85 (1975), the court held that the abduction of a bank president's wife and the subsequent demand for ransom from her husband affected interstate commerce. In so holding, the court emphasized that the defendants chose the bank president because he had access to the bank's funds, that the ransom demand was made on a Friday when the bank was likely to have abundant cash on hand, and that the bank paid the ransom without any promissory note from its president.

Furthermore, the government need not prove that the kidnappers acted with the specific intent to affect interstate commerce. Instead, the government need prove only that their actions were likely to cause an entity engaged in interstate commerce to pay the ransom. *Carpenter*, 611 F.2d at 114–15; *United States v. Gupton*, 495 F.2d 550, 551 (5th Cir.1974). Also, this Court will affirm a jury's finding of an effect on interstate commerce if that finding is supported by substantial evidence, taking the view most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 68, 62 S.Ct. 457, 464, 86 L.Ed. 680 (1942); *United States v. Malatesta*, 590 F.2d 1379, 1381–82 (5th Cir.) (en banc), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777, and 444 U.S. 846, 100 S.Ct. 91, 62 L.Ed.2d 59 (1979).

The cases cited by the defendants are not to the contrary. In *United States v. Mattson*, 671 F.2d 1020, 1024–25 (7th Cir.1982), the court held that the payoff demanded

from an individual taking an electrical supervisor's test did not affect interstate commerce. However, the victim used personal assets to make the payoff, and his employer never reimbursed him. Likewise in *United States v. Kaye,* 593 F.Supp. 193, 197–99 (N.D.Ill.1984), the court held that a payoff did not affect interstate commerce because the victim made the payment from personal assets and from a personal loan. Furthermore, the indictment charged only the individual as the object of the extortion and failed to charge his employer as an object as well. Thus, these cases do not hold that an entity engaged in interstate commerce cannot be the object of extortion also directed towards an individual. Rather, they hold that extortion directed against an individual does not affect interstate commerce where the payoff does not deplete the assets of an entity engaged in interstate commerce and no other connection with interstate commerce exists.

The defendants' reliance on *United States v. Jarabek,* 726 F.2d 889 (1st Cir. 1984), is similarly misplaced. In *Jarabek,* the president of a company made payoffs to local officials from his personal assets only. Nonetheless, the court held that the payoffs affected interstate commerce because the president made them to protect his company. The defendants argue that *Jarabek* shows that the source of the funds used to make a payoff is irrelevant in establishing jurisdiction under the Hobbs Act; therefore, jurisdiction does not exist in this case merely because P & D Developers provided the money for the ransom. The defendants' reading of *Jarabek* is overbroad. It is well accepted that the use of the assets of an entity engaged in inter-

state commerce in order to make a payoff constitutes an effect on interstate commerce. *United States v. Jackson,* 748 F.2d 1535, 1537–38 (11th Cir.1984); *United States v. Sorrow,* 732 F.2d 176, 180 (11th Cir.1984). *Jarabek* merely holds that the use of such assets is not necessary to establish a nexus with interstate commerce.

■ Here there was sufficient evidence to support the jury's finding of an effect on interstate commerce. The defendants concede that P & D Developers is an entity engaged in interstate commerce. Jesus Portela had access to the assets of P & D Developers and was likely to need those assets to pay the $1,000,000 ransom. P & D Developers provided the funds for the ransom without any personal obligation from Portela. Furthermore, the defendants kidnapped Mario Portela as revenge for the insult they believed Lenore De Parias suffered in her dealings with Jesus Portela and P & D Developers. Finally, the indictment charged that both Jesus Portela and P & D Developers were the objects of the extortion. Based on this evidence, a jury properly could have concluded that both Jesus Portela and P & D Developers were the likely objects of the extortion. Consequently, jurisdiction exists under the Hobbs Act.

## B. Limitation of Cross-Examination

■ Julita De Parias argues that the district court committed reversible error in refusing to allow her to cross-examine Hector De Parias as to the portion of his plea agreement concerning an unrelated murder in Texas.[1] As part of his plea agreement with federal authorities, Hector De Parias

---

1. The government contends that Julita De Parias is barred from challenging this limitation on the cross-examination of Hector De Parias because she agreed not to cross-examine him about the Texas murder in exchange for the government's promise not to introduce evidence concerning her involvement in that homicide. The defendant denies that any such deal was made. She argues instead that the prosecutors told her counsel that they had concluded that evidence of her involvement in the Texas murder was

inadmissible as "other crimes" evidence under Fed.R.Evid. 404(b); therefore, such a concession on her part would have been illogical.

Because such a promise would constitute a waiver of the defendant's Sixth Amendment right to confrontation, defendant is not barred from asserting this claim unless she unambiguously agreed not to question Hector De Parias about the Texas murder. *United States v. Taylor,* 508 F.2d 761, 764 (5th Cir.1975). The record does not contain a clear indication that

agreed to plead guilty to federal extortion charges and to a murder charge brought by Florida. The government agreed, *inter alia,* to recommend an incarceration period of not more than twelve years and to petition Texas authorities not to prosecute him for an unrelated murder. Hector De Parias was freely cross-examined concerning the plea agreement except for the government's promise concerning the Texas murder. The court restricted the cross-examination on that subject because it believed that the defendants had agreed prior to trial to avoid any reference to the Texas murder. The court did allow Julita De Parias's counsel to ask Hector De Parias whether the government had agreed to assist him in avoiding prosecution for unrelated crimes in exchange for his plea, but the court did not allow counsel to indicate that the unrelated crime was murder. Julita De Parias contends that this limitation infringed her Sixth Amendment right to confrontation.

Despite appellant's argument to the contrary, this limitation did not violate the Sixth Amendment. A defendant is entitled to cross-examine government witnesses as to any possible motivation for lying or bias, including plea agreements. *United States v. Mayer,* 556 F.2d 245, 252 (5th Cir.1977); *United States v. Onori,* 535 F.2d 938, 945 (5th Cir.1976). However, the Sixth Amendment does not require unlimited inquiry into the potential bias of a witness. *Delaware v. Van Arsdall,* —— U.S. ——, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986); *Alford v. United States,* 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed.2d 624 (1931). Instead, a court can restrict the scope of such cross-examination as long as the ju-

rors receive sufficient information to assess the credibility of the witness. *United States v. Burke,* 738 F.2d 1225, 1227 (11th Cir.1984); *United States v. Berkowitz,* 662 F.2d 1127, 1138–39 (5th Cir. Unit B 1981). Thus the standard in reviewing any limitation on such cross-examination is not whether the excluded testimony would have altered the outcome of the trial but whether it would have given the jury a different impression of the witness's credibility. *Van Arsdall,* —— U.S. ——, 106 S.Ct. at 1436.

Often just the general contours of a plea agreement enable a jury to determine the agreement's impact on the credibility of a witness. *Burke,* 738 F.2d at 1227. Thus, when a plea agreement involves the reduction of charges in an unrelated offense in exchange for testimony, the Sixth Amendment does not mandate that the defendant be allowed to elicit the details of the unrelated offense. *United States v. Kopituk,* 690 F.2d 1289, 1336–37 (11th Cir.1982), *cert. denied,* 463 U.S. 1209, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983). Nor must the defendant always be allowed to elicit the nature of the unrelated offense in order to challenge effectively the credibility of the witness. Here, leniency for the unrelated crime constitutes but one part of the overall agreement. Furthermore, the cross-examination here explored all the other aspects of the plea agreement and revealed that Hector De Parias had parlayed a possible death sentence into a sentence of twelve years' incarceration by agreeing to testify. Therefore, knowing that the unrelated crime was murder was unlikely to alter the jury's assessment of Hector De Parias's credibility.

defendant's counsel made any such promise. Although the district court recollected that defense counsel made such a promise, it could not pinpoint when even after reviewing the record. Such a loose remembrance is an inadequate basis for finding a waiver of constitutional rights.

Although Julita De Parias is not barred from asserting this claim, Jessie Ramirez is. When counsel for Julita De Parias attempted to cross-

examine Hector De Parias concerning the Texas murder, counsel for Ramirez objected to his doing so. The doctrine of invited error precludes Ramirez from complaining now because the court followed his request. *United States v. Veteto,* 701 F.2d 136, 140 (11th Cir.), *cert. denied,* 464 U.S. 839, 104 S.Ct. 131, 78 L.Ed.2d 127 (1983); *United States v. Gibson,* 536 F.2d 1110, 1112 (5th Cir.1976) (per curiam).

Even if the limitation violated the Sixth Amendment, however, reversal is unwarranted if the limitation constitutes harmless error. In *Van Arsdall,* —— U.S. ——, 106 S.Ct. at 1436–38, the Supreme Court held that the improper restriction of cross-examination designed to show bias in the witness was subject to the harmless error standard of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The Court went on to mention several factors that are important in determining whether the restriction was harmless error: the importance of the witness's testimony, whether the evidence was cumulative, the presence or absence of conflicting or corroborating evidence on major issues, the extent of cross-examination previously permitted, and the overall strength of the prosecutor's case. *Van Arsdall,* —— U.S. ——, 106 S.Ct. at 1438.

Judged by these criteria, the limitation constitutes harmless error even though Hector De Parias was the government's key witness. He was asked whether the government agreed to assist him in avoiding prosecution for other crimes in exchange for his testimony. Furthermore, he was extensively cross-examined about other aspects of his plea agreement, his involvement in the charged crime, previous felony convictions, and the use of various drugs. Thus the jury had an ample basis for assessing his credibility even with restricted information concerning the plea agreement. Furthermore, other evidence linked Julita De Parias to the crime, and she presented no compelling evidence rebutting Hector De Parias's testimony. Given these considerations, it is highly unlikely that revealing that the unrelated offense was murder would have altered the jury's verdict; therefore, the limitation on cross-examination was harmless error.[2]

## C. Admission of Photographs

■ Ramirez argues that the admission of photographs showing the badly decomposed corpse of Mario Portela was unduly prejudicial, especially considering that a coroner was scheduled to testify as to the cause of death.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Photographs of homicide victims are relevant in showing the identity of the victim, the manner of death, the murder weapon, or any other element of the crime. *Batchelor v. Cupp,* 693 F.2d 859 (9th Cir.1982), *cert. denied,* 463 U.S. 1212, 103 S.Ct. 3547, 77 L.Ed.2d 1395 (1983); *United States v. Kaiser,* 545 F.2d 467, 476 (5th Cir.1977); *United States v. Cloudman,* 534 F.2d 123 (8th Cir.1976). The photographs here identify the victim as well as the means of death. They also corroborate the testimony of Hector De Parias whose credibility was central to the government's case. Thus these photographs were relevant to this case.

Of course, photographs of homicide victims can be extremely prejudicial. Fed.R. Evid. 403 provides that otherwise relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice...." The trial

---

2. The government argues that if Julita De Parias had cross-examined Hector De Parias about the Texas murder, the government would have been entitled to introduce evidence showing her involvement in that crime in order to present the "whole story." Therefore, the government contends, Julita De Parias was better off by not bringing up the Texas murder. The cases which the government cites all concern the introduction of "other crimes" evidence under Fed.R. Evid. 404(b) in order to explain the charged crime. *See, e.g., United States v. Williford,* 764 F.2d 1493, 1498–99 (11th Cir.1985). The defendant sought to cross-examine Hector De Parias about the Texas murder to demonstrate a motive for lying in the instant proceeding. Evidence concerning her role in that murder is irrelevant to both restoring the credibility of Hector De Parias and proving Julita De Parias's participation in the charged crime. Therefore, the government would have been unable to introduce such evidence, and the limitation on the cross-examination cannot be considered harmless error for that reason.

court has considerable discretion in determining whether the potential for prejudice outweighs any probative value, and its decision will not be upset unless it amounts to an abuse of discretion. *Kenney v. Lewis Revels Rare Coins, Inc.,* 741 F.2d 378, 383 (11th Cir.1984); *Stallworth v. Illinois Central Gulf Railroad,* 690 F.2d 858, 868–69 (11th Cir.1982). Furthermore, when reviewing a trial court's decision to admit evidence, this Court should bear in mind that Rule 403 is to be very sparingly used. *Ebanks v. Great Lakes Dredge & Dock Co.,* 688 F.2d 716, 722 (11th Cir.1982), *cert. denied,* 460 U.S. 1083, 103 S.Ct. 1774, 76 L.Ed.2d 346 (1983). Consequently, we conclude that the district court did not abuse its discretion in admitting the photographs.

Nor were the photographs inadmissible because a coroner testified as to the cause of death. Rule 403 also allows a court to exclude otherwise relevant evidence in order to avoid the "needless presentation of cumulative evidence." However, Rule 403 does not mandate exclusion merely because some overlap exists between the photographs and other evidence. *See United States v. Bowers,* 660 F.2d 527, 530 (5th Cir. Unit B 1981) (per curiam) (that defendant stipulated to cause of death does not preclude offering photographic evidence showing same). The admission of these photographs in addition to the testimony of the coroner hardly constitutes such a needless accumulation of evidence as to amount to an abuse of discretion.

D. Evidence Concerning Resistance to Arrest

■ Ramirez argues that the district court committed reversible error by admitting evidence concerning his resistance to arrest and attempted flight. FBI Special Agent Pack testified that, when he entered the Los Angeles apartment, Ramirez was pointing a gun at him and that, when FBI agents approached him, Ramirez dropped the gun and ran out of the room. Ramirez argues that such evidence is irrelevant,

Fed.R.Evid. 401, and that it is merely evidence of bad character and other crimes. Fed.R.Evid. 404.

This argument is spurious. Evidence of resistance to arrest and flight is admissible to demonstrate consciousness of guilt and thereby guilt. *United States v. Peltier,* 585 F.2d 314, 323 n. 7 (8th Cir.1978), *cert. denied,* 440 U.S. 945, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979); *United States v. Myers,* 550 F.2d 1036, 1049 (5th Cir.1977), *cert. denied,* 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978); *United States v. Epperson,* 528 F.2d 48, 50–51 (9th Cir.1975). This includes evidence that the defendant was in possession of guns and ammunition at the time. *United States v. Graham,* 548 F.2d 1302, 1313 n. 13 (8th Cir.1977). Therefore, evidence of Ramirez's resistance to arrest and attempted flight is relevant to proving the charged offense and is not merely "other crimes" evidence.

However, because such evidence is relevant insofar as it shows consciousness of guilt, its probative value diminishes if the defendant has committed several unrelated crimes. In those circumstances, resistance to arrest may indicate consciousness of guilt as to the unrelated crimes and not to the charged crime. *United States v. Howze,* 668 F.2d 322, 324–25 (7th Cir.1982); *United States v. Beahm,* 664 F.2d 414, 419–20 (4th Cir.1981); *Myers,* 550 F.2d at 1048–50. Ramirez has been implicated in an unrelated crime—a murder in Texas; therefore, his resistance to arrest may indicate consciousness of guilt as to the Texas crime only. However, the presence of unrelated crimes does not make evidence of resistance to arrest inadmissible. Instead, it means only that such evidence alone is insufficient to demonstrate consciousness of guilt of the charged crime. *Myers,* 550 F.2d at 1048–50.

Ramirez also argues that the evidence is inadmissible because he thought the arresting officers were robbers. That, however, is a question for the trier of fact and does not bar the admission of the evidence.

## E. Admission of Julita De Parias's Statements

■ Ramirez challenges the admission of statements made by Julita De Parias at the time of her arrest. FBI Special Agent Trimarco testified that shortly after she was arrested, Julita De Parias exclaimed that "she was going with two killers. That she was going to prison forever. That she had tried to kill herself 10 times in the past. That if she talked, they would kill her. That she was there, but she didn't do anything." Ramirez contends that those statements were unduly prejudicial and violated his Sixth Amendment right to confrontation.

In *Bruton v. United States*, 391 U.S. 123, 135–36, 88 S.Ct. 1620, 1627–28, 20 L.Ed.2d 476 (1968), the Supreme Court held that the admission of a nontestifying defendant's statements that inculpate another defendant violates the latter defendant's Sixth Amendment right to confrontation. For the admission of a co-defendant's statements to constitute a *Bruton* violation, however, the statements standing alone must clearly inculpate the defendant. *United States v. Beard*, 775 F.2d 1577, 1581 (11th Cir.1985), *cert. denied*, — U.S. ——, 106 S.Ct. 1235, 89 L.Ed.2d 343 (1986). *United States v. Satterfield*, 743 F.2d 827, 849 (11th Cir.1984), *cert. denied*, 471 U.S. 1117, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1985). Even though Julita De Parias did not mention Ramirez by name, the circumstances of the case and the other evidence virtually compel the inference that she was referring to him and Julio. *Harrington v. California*, 395 U.S. 250, 253, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969); *Hodges v. Rose*, 570 F.2d 643, 647 (6th Cir.), *cert. denied*, 436 U.S. 909, 98 S.Ct. 2243, 56 L.Ed.2d 408 (1978). However, her statements do not clearly implicate Ramirez in the charged offense. Although they suggest some general wrongdoing on his part, they do not mention Mario Portela, his kidnapping or his murder.

Furthermore, even if the statements clearly inculpate Ramirez in the crime, their admission is harmless error. A *Bruton* violation is harmless error where the independent evidence indicating guilt is overwhelming. *Harrington*, 395 U.S. at 253–54, 89 S.Ct. at 1728. Here the government presented overwhelming independent evidence indicating Ramirez's guilt. The testimony of Hector De Parias, Ramirez's fingerprints on the duct tape, and other physical evidence convincingly demonstrated his guilt. The statements by Julita De Parias added little to the prosecution's case, thus their admission constitutes harmless error.

## F. Prosecutor's Statements

■ Ramirez argues that the prosecutor improperly commented on his right to remain silent in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). During the government's cross-examination of Ramirez, the prosecutor responded to Ramirez's denial that he knew anything about the kidnapping and murder by stating that, "Today, sir, is the first day that you are telling anybody this tale; isn't that correct?" Later, when Ramirez testified that he traveled with the De Pariases from Miami to Los Angeles, the prosecutor asked him, "And you never told them [the FBI] about this trip from Miami to Los Angeles did you?" Ramirez argues that these remarks warrant a mistrial.

That argument is meritless because the prosecutor was not commenting on appellant's post-arrest silence. Instead, the prosecutor was attempting to impeach Ramirez's testimony on the basis of his prior inconsistent statements. After Ramirez was arrested and given his *Miranda* warnings, he gave the police a detailed statement in which he disclaimed any knowledge of the kidnapping. Ramirez also claimed at that time that he met the De Pariases in Los Angeles. At the trial, however, Ramirez testified that he travelled with the De Pariases from Miami to Los Angeles and that they told him about the kidnap-

ping and murder en route. The prosecution was entitled to use Ramirez's post-arrest statements in order to impeach his testimony at trial. *Anderson v. Charles*, 447 U.S. 404, 408–09, 100 S.Ct. 2180, 2182, 65 L.Ed.2d 222 (1980) (per curiam); *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

### G. Use of Exculpatory Post-Arrest Statements

Ramirez also contends that the use of his post-arrest statements to impeach his testimony was unconstitutional because he did not knowingly and voluntarily waive his right to be silent. After being arrested and read his rights, Ramirez was interrogated despite his refusal to waive his right to remain silent. At 5:00 a.m., after six hours of questioning, he told the police that he knew nothing about the kidnapping and murder of Mario Portela. This was the exculpatory statement the prosecution used to impeach his testimony at trial. However, because the prosecution used that statement only for impeachment purposes, its use was permissible. *Oregon v. Hass*, 420 U.S. 714, 720–24, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *Harris v. New York*, 401 U.S. at 224–26, 91 S.Ct. at 645–46.

However, the prosecution cannot use Ramirez's post-arrest statement even for impeachment if it is involuntary. *Hass*, 420 U.S. at 723, 95 S.Ct. at 1221. Nor can the prosecutorial use of involuntary statements ever constitute harmless error. *Mincey v. Arizona*, 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978); *Chapman v. California*, 386 U.S. 18, 23 & n. 8, 87 S.Ct. 824, 828 n. 8, 17 L.Ed.2d 705 (1967). Nonetheless, this Court will not upset a district court's determination that a statement was voluntary unless clearly erroneous. *United States v. Beck*, 729 F.2d 1329, 1333 (11th Cir.), *cert. denied*, 469 U.S. 981, 105 S.Ct. 383, 83 L.Ed.2d 318 (1984). The interrogation was the type that normally ensues immediately following arrest. Ramirez has not indicated any untoward pressure or unfair tactic that would make the district court's determination clearly erroneous.

### H. Hair Samples

Ramirez contends that the district court's post-indictment order compelling him to provide scalp hair samples violated his Fourth Amendment rights because the government lacked probable cause for invading his bodily privacy. The government argues in response that people do not have any reasonable expectation of privacy as to their scalp hair; therefore, the involuntary removal of a scalp hair sample does not implicate the Fourth Amendment.

Federal courts are undecided as to whether the involuntary removal of hair samples constitutes a search and seizure under the Fourth Amendment. *Compare In Re Grand Jury Proceedings (Mills)*, 686 F.2d 135, 137–40 (3d Cir.), *cert. denied*, 459 U.S. 1020, 103 S.Ct. 386, 74 L.Ed.2d 517 (1982) (involuntary removal of facial and scalp hair in grand jury proceeding not search and seizure), *with Bouse v. Bussey*, 573 F.2d 548, 550 (9th Cir.1977) (warrantless plucking of pubic hair violates Constitution). *See also United States v. Weir*, 657 F.2d 1005, 1007 (8th Cir.1981) (plucking hair constitutes search and seizure but intrusion so minor that Fourth Amendment rights not implicated); *United States v. D'Amico*, 408 F.2d 331, 332–33 (2d Cir. 1969) (removal of hair sample a seizure but not unreasonable). The resolution of this question apparently depends on whether a hair sample is more akin to a blood sample or to voice and handwriting exemplars. *Compare Schmerber v. California*, 384 U.S. 757, 767, 86 S.Ct. 1826, 1833, 16 L.Ed.2d 908 (1966) (involuntary blood sample constitutes a search), *with United States v. Dionisio*, 410 U.S. 1, 14–15, 93 S.Ct. 764, 771–72, 35 L.Ed.2d 67 (1973) (compelling voice exemplar is not a search); *United States v. Mara*, 410 U.S. 19, 21, 93 S.Ct. 774, 775, 35 L.Ed.2d 99 (1973) (compelling handwriting exemplar is not a search).

However, we need not resolve that issue here because the government established probable cause for its request of the

hair sample. In support of its motion, the government provided a sworn affidavit from the FBI case agent stating that Mario Portela had been murdered in Apartment 315 and that numerous human hairs had been found there. In *United States v. Andersen*, 739 F.2d 1254, 1256–57 (7th Cir. 1984), the court held that a similar post-indictment affidavit established probable cause to support a search warrant compelling the production of a hair sample. Furthermore, Hector De Parias told the FBI that Ramirez had been in the apartment at the time of the murder. Thus, the court had sufficient "essential facts" establishing probable cause for believing that the hair in Apartment 315 belonged to Jessie Ramirez. *United States v. Haimowitz*, 706 F.2d 1549 (11th Cir.1983), *cert. denied*, 464 U.S. 1069, 104 S.Ct. 974, 79 L.Ed.2d 212 (1984).

By clipping only a few hairs, the government did not impose an unreasonable surgical intrusion on appellant's body or expose him to unreasonable medical risk. *Winston v. Lee*, 470 U.S. 753, 105 S.Ct. 1611, 1620, 84 L.Ed.2d 662 (1985) (surgical removal of bullet presents undue medical risk). Therefore, the order compelling the hair sample was proper.

## I. Entry Into the Los Angeles Apartment

■ Ramirez argues that the entry of the FBI agents into his Los Angeles apartment violated his Fourth Amendment rights because the FBI possessed only arrest warrants for Julio and Julita De Parias. An arrest warrant alone is an insufficient basis for searching a third party's home for those named in the warrant. *Steagald v. United States*, 451 U.S. 204, 213, 101 S.Ct. 1642, 1648, 68 L.Ed.2d 38 (1981). Therefore, Ramirez argues, the FBI needed a search warrant to enter the apartment.

Ramirez's argument rests on the assumption that the apartment was also not the residence of Julio and Julita De Parias, for "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980). The district court's determination that the FBI agents reasonably believed that Julio and Julita De Parias resided in the apartment and were in there at the time is not clearly erroneous. The apartment manager had informed the FBI agents that the De Pariases lived there and that they were home if a certain car was parked in front of the apartment. That car was present when the FBI agents arrived. Therefore, the arrest warrant alone authorized their entry.

■ Ramirez argues also that the entry was unlawful because the FBI agents failed to comply with the "knock and announce" rule of 18 U.S.C.A. § 3109.[3] Admittedly, the FBI agents failed to announce themselves or their purpose before entering the apartment. However, an officer's reasonable belief that such announcement might imperil himself or other officers excuses non-compliance with the statute. *United States v. Manfredi*, 722 F.2d 519 (9th Cir.1983); *Rodriguez v. Jones*, 473 F.2d 599 (5th Cir.), *cert. denied*, 412 U.S. 953, 93 S.Ct. 3023, 37 L.Ed.2d 1007 (1973). The De Pariases were suspects in a brutal kidnapping and murder. The bulletin transmitted to the FBI agents in Los Angeles said they were armed and dangerous. Furthermore, the arrest was being made at night. Under these circumstances, the arresting officers reasonably believed that compliance with the "knock and announce" rule might endanger themselves, thus their non-compliance is excused.

**3.** 18 U.S.C.A. § 3109 provides:

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of his warrant.

This section applies to forcible entries to execute arrest warrants. *United States v. Kulcsar*, 586 F.2d 1283 (8th Cir.1978).

**J. Pretextual Arrest**

■ Ramirez seeks to suppress evidence discovered in the Los Angeles apartment on the grounds that his arrest, which justified the search of the apartment, was pretextual. This claim is meritless. Probable cause for an arrest exists where the arresting officer possesses reasonably trustworthy information that indicates to a reasonable mind that an offense has been or is being committed. *United States v. Willis*, 759 F.2d 1486, 1494–95 (11th Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985); *United States v. Blasco*, 702 F.2d 1315, 1324 (11th Cir.1983). As the FBI agents entered the apartment, they identified themselves and saw Ramirez lying on the floor aiming a gun at them. That alone provided probable cause for arresting appellant on the grounds of assaulting an officer. Therefore, Ramirez's arrest was not pretextual, and the search of the apartment incident to his arrest was valid.

**K. Search of the Miami Apartment**

■ Ramirez challenges the admission of a blue velvet blazer and a pair of shoes which the FBI obtained in a Miami apartment he had shared with Gloria Paredes, his girlfriend. Ramirez claims that the search violated his Fourth Amendment rights against unreasonable search and seizure. This claim too is meritless. When Ramirez fled Miami, he told Paredes that he was leaving for Houston and not coming back. Thus, by the time the FBI searched the apartment, Ramirez had abandoned the clothing. Because Ramirez had abandoned the property, the search did not violate his constitutional rights. *Abel v. United States*, 362 U.S. 217, 240–41, 80 S.Ct. 683, 697–98, 4 L.Ed.2d 668 (1960); *United States v. Maryland*, 479 F.2d 566, 568 (5th Cir.1973) (per curiam). Although Ramirez fled Miami to avoid capture, a lawful police investigation does not constitute such coercion that the abandonment should be considered involuntary. *Maryland*, 479 F.2d at 568.

■ Furthermore, Paredes consented to the search of the apartment, and a search consented to by one who "possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *United States v. Matlock*, 415 U.S. 164, 170, 94 S.Ct. 988, 992, 39 L.Ed.2d 242 (1974). In *Matlock*, the Supreme Court held that a search of the defendant's bedroom did not violate the Fourth Amendment because the woman with whom the defendant cohabitated consented to the search. Here, Paredes lived in the apartment with Ramirez, paid the rent, and had control over the entire premises. Therefore, her authorization validated the search.

Accordingly, the opinion of the district court is AFFIRMED.